**HARTFORD FIRE INSURANCE COMPANY, Plaintiff,**

v.

**FEDERATED DEPARTMENT STORES, INC., Campeau Corporation, Campeau Corporation (U.S.) Inc., and CRTF Corporation, Defendants.**

**Bernard SEGAL, M.D., Trustee, Individually and on behalf of all those similarly situated, Plaintiff,**

v.

**FEDERATED DEPARTMENT STORES, INC., Philip Caldwell, Howard Goldfeder, William G. Miller, Peter G. Peter-** son, Marvin S. Traub, Kathryn D. Wriston, Charlotte Beers, John W. Burden, III, James L. Ferguson, Reginald H. Jones, Will M. Storey, Clifton R. Wharton, Robert A. Charpie, Howard W. Johnson, Daniel W. LeBlond, Norman S. Matthews, Donald J. Stone, Campeau Corporation, Campeau Corporation (U.S.) Inc., CRTF Corporation, Shearson Lehman Hutton Inc., and Goldman Sachs & Co., Defendants.

Nos. 88 Civ. 8460(RWS), 88 Civ. 8688(RWS).

United States District Court, S.D. New York.

Oct. 13, 1989.

---

LeBoeuf, Lamb, Leiby & MacRae, New York City (Grant S. Lewis, Charles C. Platt, Stephen C. Clark, Wallace A. Showman, of counsel), for plaintiff Hartford Fire Ins.

Cravath, Swaine & Moore, New York City (Ronald S. Rolfe, Alden L. Atkins, Kent A. Yalowitz, of counsel), for defendants except Shearson Lehman Hutton, Inc. and Goldman Sachs & Co.

Goodkind, Labaton & Rudoff, New York City (Lawrence R. Sucharow, of counsel), Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa. (Stuart H. Savett, of counsel), Greenfield & Chimicles, Haverford, Pa. (Richard D. Greenfield, of counsel), for plaintiffs Bernard Segal, et al.

Simpson Thacher & Bartlett, P.C., New York City (Kenneth R. Logan, Joseph Wayland, of counsel), for defendants Shearson Lehman Hutton, Inc. and Goldman Sachs & Co.

SWEET, District Judge.

Defendants Federated Department Stores, Inc. ("Federated"), *et al.*, have moved pursuant to Rules 12(b)(6), 56, and 9(b), Fed.R.Civ.P., for an order dismissing the first amended complaint of Hartford Fire Insurance Company ("Hartford") and the complaint of Bernard Segal, M.D. ("Segal") (together with Hartford referred to as the "Plaintiffs"), trustee individually and on behalf of all those similarly situated.[1] For the reasons set forth below, the motions are granted and the complaints are dismissed in their entirety.

*The Parties*

Hartford is a Connecticut insurance company with its principal place of business in Hartford, Connecticut. Segal served as Trustee of the Likoff–Segal Associates Defined Benefit Pension Plan Trust.

Federated is a retailing conglomerate incorporated in Delaware with its principal place of business in Cincinnati, Ohio. As of January 30, 1988, Federated's department store chains included Bloomingdale's, Filene's, Bullock's/Bullocks Wilshire, I. Magnin, and Rich's.

Campeau Canada, an Ontario corporation with its principal place of business in Toronto, Ontario, Canada, owns shopping centers, office complexes, and suburban business parks in Canada and retail operations in the United States. Campeau U.S., a Delaware Corporation with its principal place of business in Toronto, Ontario, Canada, is a wholly-owned subsidiary of Campeau Canada. CRTF, a New York corporation with its principal place of business in Toronto, Ontario, Canada, is a wholly owned subsidiary of Campeau U.S. that was formed for the purpose of acquiring Federated.

The Individual Defendants in the Segal Action were Federated directors and/or officers during the events at issue. Shearson and Goldman Sachs are investment banks maintaining principal places of business in New York, New York.

*The Facts*

On January 22, 1987, Federated filed a shelf registration under SEC Rule 415 to issue up to $500 million of debt securities in one or more separate series. On October 22, 1987, pursuant to its shelf registration and a January 15, 1987 Indenture Agreement (the "Indenture") between Federated and Manufacturers Hanover Trust ("Manufacturers"), Federated issued $200 million in notes bearing interest at a rate of 9.375% due November 1, 1992 (the "Notes"). Federated marketed the Notes pursuant to a prospectus dated January 22, 1987 (the "Prospectus") and a prospectus supplement dated October 22, 1987 (the "Prospectus Supplement"). Shearson and Goldman Sachs served as lead underwriters for twenty-six underwriters participating in the offering.

Standard & Poor's ("S & P") rated the Notes "AA-," and Moody's rated them "Aa2." According to the Plaintiffs, these ratings "indicated that the debtor had an extremely strong capacity to pay the interest and repay principal and that the debt securities were of high quality by all standards." Hartford Amended Complaint

---

1. This opinion addresses three motions filed in two separate actions involving similar claims. In the first action (88 Civ. 8460) (the "Hartford Action"), Hartford sued Federated, Campeau Corporation ("Campeau Canada"), Campeau Corporation (U.S.) ("Campeau U.S."), and CRTF Corporation ("CRTF") (collectively referred to as the "Hartford Defendants"). The Hartford Defendants have all moved to dismiss the first amended complaint. In the second action (88 Civ. 8460) (the "Segal Action"), Segal sued Federated, Campeau Canada, Campeau U.S., CRTF, numerous individual defendants, including Philip Caldwell, Howard Goldfeder, G. William Miller, Peter G. Peterson, Marvin S. Traub, Kathryn D. Wriston, Charlotte Beers, John W. Burden, III, James L Ferguson, Reginald H. Jones, Will M. Storey, Clifton R. Wharton, Jr., Robert A. Charpie, Howard A. Johnson, Daniel W. LeBlond, Norman S. Matthews, Donald J. Stone, (collectively referred to as the "Individual Defendants" and, together with Federated, Campeau Canada, Campeau U.S., and CRTF, as the "Federated Defendants"), and Shearson Lehman Hutton Inc. ("Shearson") and Goldman, Sachs and Co. ("Goldman, Sachs") (both referred to as the "Underwriter Defendants"). The Federated Defendants and the Underwriter Defendants have moved separately to dismiss the complaint. Although the Federated and Segal Actions have not been consolidated formally, the parties argued the motions together, and the briefs and affidavits cross-reference one another.

¶ 18; Segal Complaint ¶ 26. When they were issued, the Notes had a spread of eighty-five basis points to United States Treasury securities of comparable maturity.

On October 22, 1987, Hartford bought $25,000,000 of the Notes at 100% of face value. Segal bought 100 Notes for $100,828.13 on October 26, 1987, and he has brought this action on behalf of all persons who bought Notes between October 22, 1987 and January 25, 1988 and owned them until January 25, 1988. The Plaintiffs allege that they considered the Notes "safe, low-risk corporate securities" when they purchased them. Hartford Amended Complaint ¶ 18; Segal Complaint ¶ 26.

Federated's offering and the Plaintiffs' purchases occurred when Federated was considered a possible takeover candidate. In support of their motions, the Defendants have submitted more than sixty articles revealing that the press and the financial community had anticipated a possible takeover of Federated for several years.[2] For example:

—On December 23, 1984, analysts at Oppenheimer & Co. said "[i]n the retailing industry which has already witnessed several takeovers, Federated Department Stores ... made the list" of possible takeover targets.

—On May 1, 1985, the *New York Times* reported a "flood of takeover rumors involving some of the major department store chains, such as ... Federated Department Stores."

—On July 1, 1986, the *Wall Street Journal*'s "Heard on the Street" column identified Federated as one of a "half-dozen" retail stocks that are potential takeover targets.

—On October 9, 1986, the *Wall Street Journal* reported that "several analysts said this retailer [Federated] is one of the more attractive takeover possibilities."

—Also on October 9, 1986, the *Washington Post* reported that "among the companies most frequently mentioned [as a takeover target] is Federated Department Stores."

—On October 29, 1986, the *Wall Street Journal* reported that Federated is "the subject of continued takeover or restructuring speculation."

—On October 30, 1986, *Women's Wear Daily* reported that Federated would be the "next major retailer to become a takeover target."

—On November 19, 1986, the Dow Jones News Wire reported that Federated was one of twelve companies whose stock was included in the Dow Jones "speculative index" of likely takeover or restructuring candidates.

—On January 26, April 7, and October 5, 1987, financial analysts at Cyrus J. Lawrence, Inc., a brokerage firm, listed Federated as among the five retail companies most susceptible to an acquisition.

—On August 28, 1987, Bear, Stearns & Company reported in its research highlights that "Federated is an attractive potential takeover target."

—On October 20, 1987, Drexel Burnham Lambert reported Federated as one of four retail stocks that "have been in the potential takeover arena, and given the recent price adjustments, they would appear to be quite attractive."

In addition, Federated had responded to these rumors by taking steps to discourage a takeover, and those measures were disclosed by Federated and publicly reported. In January 1986, Federated instituted a shareholders rights plan, which it described in a press release as follows:

While we have no knowledge that anyone is contemplating a hostile move against the company, the Board believes that our action is prudent in light of the current takeover environment. The plan is not designed to prevent a takeover on terms that are fair and acceptable to all shareholders but to deal with unilateral actions by hostile acquirors which could

---

**2.** The Defendants have moved for summary judgment prior to discovery to present these materials to the court.

deprive the Board and our shareholders of the ability to make reasoned decisions. Federated also submitted this press release with its Form 8–K filed with the SEC. In November 1986, Federated repurchased a large block of its shares from a single shareholder, and it subsequently expanded that repurchase plan to cover a total of 10 million shares. Federated disclosed the repurchase authorization in a press release and included the authorization in its 1986 Annual Report filed with the SEC.

The Plaintiffs also allege that "Mr. Howard Goldfeder, Federated's Chairman ["Goldfeder"], had been considering a leveraged buy-out of the company prior to the offering of the Notes." This allegation emerged from a January 27, 1988 *Wall Street Journal* article that appeared following CRTF's bid for Federated, stating: "One favored defense—a management-led buy-out that Mr. Goldfeder has been considering for months—is increasingly improbable because of financing difficulties and internal strife."

On January 25, 1988, CRTF launched a $4.2 billion hostile tender offer for Federated. Federated had not solicited the offer, and CRTF had not contacted Federated prior to making its bid. Federated's board of directors rejected CRTF's bid as inadequate, and R.H. Macy & Company submitted a competing offer. After several weeks of competitive bidding, Federated agreed to be acquired by CRTF for $6.6 billion in what the Plaintiffs characterize as a "highly leveraged transaction." Hartford Amended Complaint ¶ 22; Segal Complaint ¶ 28.

The Plaintiffs contend that the CRTF acquisition drastically altered Federated's financial position. According to the Plaintiffs, Federated's debt-to-equity ratio "has soared," and the interest expense on its new debt "not only radically exceeds historic levels, but approaches and possibly exceeds Federated's earnings." Hartford Amended Complaint ¶ 23; *accord* Segal Complaint ¶ 30. As a consequence, the Plaintiffs assert, Federated has been forced to sell many of its retail operations—including Filene's, Foley's, Bullock's/Bullocks Wilshire, and I. Magnin—and this divestiture in turn "will drastically reduce Federated's cash flow and operating earnings, and seriously impair Federated's ability to meet its long-term debt obligations...." Hartford Amended Complaint ¶ 24; *accord* Segal Complaint ¶ 31.

The Plaintiffs further claim that the CRTF acquisition has had a dramatic influence on the Notes, asserting that the transaction "convert[ed] the Notes, as well as all of Federated's investment-grade debt, to 'junk,' without affording any compensation or protection for the additional risk." Hartford Amended Complaint ¶ 25; *accord* Segal Complaint ¶ 33. Following the acquisition, S & P downgraded the Notes from "AA–" to "B," and Moody's reduced their rating from "Aa2" to "B2." Hartford sold its Notes on November 17, 1988 at a loss totaling $4.33 million. At that time, the Notes had a yield to maturity of 15.415%, a spread of 658 basis points to United States Treasury securities of comparable maturity, and a market value of 82.67% of par.

*Prior Proceedings*

Segal filed his complaint on December 8, 1988, and Hartford filed its amended complaint on December 23, 1988. The Plaintiffs have alleged violations of the federal securities laws, including sections 11 and 12 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77*l*, section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder (Rule 10b–5), 17 C.F.R. § 240.10b–5. Hartford and Segal also have alleged state law causes of action for fraud, negligent misrepresentation, breach of implied duty of good faith and fair dealing, promissory estoppel, and tortious interference with contract. In addition, Hartford has asserted state law claims for mistake and unjust enrichment.

The Federated Defendants and the Underwriter Defendants have moved pursuant to Rules 12(b)(6), 56, and 9(b), Fed.R. Civ.P., to dismiss the Hartford and Segal Actions in their entirety. Oral argument was heard on March 21, 1989, and the court considered the motions fully submitted on

June 6, 1989, after receiving subsequent submissions from the parties.

*Discussion*

### A. Standards for a Motion to Dismiss

A court should dismiss a complaint for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P., only if it appears beyond doubt that the plaintiff can prove no set of facts supporting its claim that entitles it to relief. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, — U.S. —, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A court must construe the complaint's allegations in the light most favorable to the plaintiff and accept those allegations as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Assoc.*, 423 F.2d 188, 191 (2d Cir.1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970).

### B. Standards for Summary Judgment

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir. 1988). All ambiguities are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

The Supreme Court recently has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Summary judgment is permissible only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

However, courts should not be reluctant to grant summary judgment in appropriate cases. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), thereby permitting courts to avoid "protracted, expensive and harassing trials." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### C. The Failure to Disclose Claims

The Plaintiffs' federal securities law claims and their state claims for fraud and negligent misrepresentation rest upon the same basic theory: 1) that the Plaintiffs bought the Notes relying upon statements Federated made in the registration statement, the Prospectus, the Prospectus Supplement, and other public documents concerning the company's financial stability and long-term outlook; 2) that at the time it made those statements, Federated knew it was a potential takeover target and that a takeover—particularly a highly leveraged takeover—could increase the Notes' riskiness and reduce their market price; 3) that the takeover threat and Federated's assessment of and potential response to that threat constituted material information; and 4) that Federated had a duty to disclose that information to prevent its other representations from being misleading, but failed to make the necessary disclosures.

The Plaintiffs have identified several representations in the Prospectus, the Pro-

spectus Supplement, and Federated's 1986 Annual Report that they allegedly relied upon when they bought the Notes. These include representations that:

—Federated had an exceptionally sound balance sheet, significant financial strength, and a long-term financial strategy to build on that strength for the future;

—Federated's total debt at the end of fiscal 1986 was just over $1 billion and had historically been in the same range or lower; Federated's ratio of long-term debt to shareholders' equity was .30:1 and had historically been in the same range or lower; and Federated had reduced its interest expense from $86.4 million in fiscal 1985 to $79.8 million in fiscal 1986 and had taken other steps to reduce its future interest expense;

—The net proceeds to be received by Federated from the sale of the debt securities would be used for general corporate purposes, including the repayment of borrowings. By offering debt securities for this purpose, Federated indicated that one of its goals was the reduction of interest costs by repayment of debt owed at higher interest rates than currently prevailing;

—Federated's ratio of earnings to fixed charges, a key indicator of a company's ability to repay its debt obligations, historically had been in the range of four or five to one, and was 4.96 to one at the end of fiscal 1986.

—Federated's financial condition was "one of the best in the retail industry";

—Federated's "financial strength and flexibility are factors key to the company's ability to grow and develop for the future";

—Management had "preserved and strengthened the company's financial position";

—Federated planned to reduce and control interest expense; and

—Federated's long-term strategy for operations was to remodel and expand existing stores, while selectively opening new stores.

Hartford Amended Complaint ¶¶ 12, 15; Segal Complaint ¶¶ 16–23.

The Plaintiffs do not allege that these statements themselves were false.[3] Rather, they contend that Federated failed to disclose additional material facts to alert investors that the company's financial status and long-term outlook "was subject to radical change in the event of a restructuring or acquisition of Federated, which in turn would destroy the value of the Notes as investment-grade securities." Hartford Amended Complaint ¶ 16. The allegedly omitted facts included:

—That Federated's Board knew the company was an "attractive" takeover candidate;

—That Federated's Board had considered, at various times, the possibility that offers for the company might be received which would cause the Board and management to abandon their long-term business strategies and put the company up for auction;

—That Federated was prepared to entertain, and believed it could approve, highly-leveraged transactions that would cause the Notes being offered as investment-grade to become "junk";

—That such transactions (i) would render meaningless the financial information disclosed by Federated in connection

---

3. Indeed, as general discussions of corporate policy, many of these representations would not be actionable. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 164 (2d Cir.1980) (general statement that "we expect another good year" is not misleading); *Pross v. Katz,* 784 F.2d 455, 458 ((2d Cir.1986) ("generalized statements to act as a faithful fiduciary" are not actionable); *Intercontinental Monetary Corp. v. Performance Guarantees, Inc.,* 88 Civ. 4462 (RLC), slip op. at 18, 1988 WL125679 (S.D.N.Y. Nov. 10, 1988) ("Mere unfulfilled promissory statements as to

what will be done in the future are not actionable as fraud") (*quoting Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 194 (2d Dep't 1980)); *In re Craftmatic Sec. Litig.,* 703 F.Supp. 1175, 1180 (E.D.Pa.1989) (rejecting argument that "[h]aving loudly promoted their products and marketing efficiencies in press releases, public documents and other public statements, defendants were required to disclose the *complete* truth about the serious problems [defendant] was facing in connection with those areas of its business") (emphasis in original).

with the sale of its Notes, (ii) could cause Federated's total debt, debt-to-equity ratio, interest expenses, and ratio of earnings to fixed charges to reach unprecedented and dangerous levels, and (iii) would destroy the value of the Notes being offered as investment-grade securities;

—The circumstances under which Federated's Board of Directors was prepared to approve (or believed itself required to approve) such transactions; and

—That Federated's financial condition could change radically in the event of an acquisition or restructuring of Federated, and that offerees should exercise caution before relying upon the financial information furnished.

Hartford Amended Complaint ¶¶ 14, 16; Segal Complaint ¶¶ 22, 27, 33, 37. Although it appears nowhere in the complaint or amended complaint, the Plaintiffs also contend in their papers submitted in connection with these motions that Federated failed to disclose that Goldfeder had been considering a leveraged buy-out of the company prior to the offering of the Notes.

Courts have long wrestled with defining the point at which a company must disclose to its shareholders facts concerning a transaction—usually a merger—that will alter fundamentally the nature of the enterprise. Here, the Plaintiffs' securities law, fraud, and negligent misrepresentation claims offer a new variation on this theme: the Plaintiffs are bondholders—not shareholders—who challenge Federated's failure to disclose information relating to a hypothetical takeover—not one that actually had crystallized into an offer and subsequent negotiations—when it issued the Notes. Although the context is new, however, the inquiry remains the same: Was the information concerning a possible takeover material? [4]

Circuit Courts addressing the materiality of information regarding a possible takeover have reached different results. Some courts have found such information immaterial as a matter of law until the parties agree in principle on the deal's price and structure. *See, e.g., Flamm v. Eberstadt,* 814 F.2d 1169, 1175 (7th Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *Greenfield v. Heublein, Inc.,* 742 F.2d 751, 756 (3d Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); *Reiss v. Pan Am. World Airways, Inc.,* 711 F.2d 11, 14 (2d Cir.1983); *Staffin v. Greenberg,* 672 F.2d 1196, 1206 (3d Cir.1982). Others have concluded that preliminary merger negotiations become material by virtue of the company publicly denying their existence. *See, e.g., Levinson v. Basic, Inc.,* 786 F.2d 741, 748 (6th Cir.1986). Still others have treated the materiality of merger negotiations as a factual inquiry to be determined on a case-by-case basis with reference to the totality of the circumstances. *See, e.g., Holmes v. Bateson,* 583 F.2d 542, 558 (1st Cir.1978).

In *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court resolved this split in the Circuits by adopting a fact-specific, case-by-case approach for determining the materiality of merger negotiations. Noting that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render the merger discussions material," *id.* 108 S.Ct. at 987, the Supreme Court rejected both the agreement-in-principle test and the Sixth Circuit's ruling that merger negotiations become material by virtue of a statement denying their existence. Instead, the Court adopted the definition of materiality

---

**4.** The Plaintiffs' securities law, fraud, and negligent misrepresentation claims all require that the alleged misrepresentations or omissions be material. *See* 15 U.S.C. § 77k (Section 11 of the Securities Act); *id.* § 77*l* (Section 12 of the Securities Act); 17 C.F.R. § 240.10b–5 (Rule 10b–5); *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (standards for materiality are the same under Rule 10b–5 as under the Securities Act); *Starkman v. War-*

*ner Communications, Inc.,* 671 F.Supp. 297, 308 (S.D.N.Y.1987) ("defendants' duty to plaintiffs is no greater under common law fraud than under Rule 10b–5"); *George Backer Management Corp. v. ACME Quilting Co.,* 46 N.Y.2d 211, 385 N.E.2d 1062, 1067, 413 N.Y.S.2d 135, 140 (1978) (statement must be material to be actionable for fraud); *White v. Guarente,* 43 N.Y.2d 356, 372 N.E.2d 315, 319, 401 N.Y.S.2d 474, 478 (1977) (negligent misrepresentation must be material).

it had applied in cases arising under section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), holding that information concerning preliminary merger negotiations is material " 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.' " *Id.* 108 S.Ct. at 983 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The Court elaborated: " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Id.* (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132).

The Supreme Court described a possible takeover as a "contingent or speculative" occurrence, and it directed courts to assess its materiality by balancing " 'both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " *Id.* 108 S.Ct. at 986–87 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).

To appraise a possible takeover's probability, the Court recommended that a court look to "indicia of interest in the transaction at the highest corporate levels." *Id.* 108 S.Ct. at 987. As examples of such indicia, the Court listed "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries...." *Id.* However, the Supreme Court did not intend this list to be exhaustive, *see id.*, and other courts have identified additional factors demonstrating the probability that a merger will occur. *See, e.g., Rowe v. Maremont Corp.*, 850 F.2d 1226 (7th Cir.1988) (potential acquirer had retained a law firm specializing in acquisitions, hired a brokerage firm to help it acquire stock, and met with target executives to discuss an acquisition); *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2d Cir.1987) (company had retained an investment bank to consider selling a subsidiary and the investment bank had discussed the sale with company

executives, but not presented a proposal to the board), *cert. denied*, —— U.S. ——, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988); *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir.1974) (defendant purchased shares knowing that the company's president wanted to merge with another company, that the firms had commenced merger discussions, and that a director for the other company had reacted favorably to the merger and promised to propose the merger to his board).

A review of the case law also reveals circumstances in which there is little probability that a takeover will occur. For example, a transaction is too incipient to be material where a company has resolved to undertake a sale or merger but has not yet identified a potential partner or has made no contact with a partner it has identified. *See, e.g., List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir.) (no materiality where a director bought shares in his company knowing that the board had resolved to sell or merge the company relying upon its union manager's representation that he knew someone who might be interested in buying the company, although he had not disclosed the buyer's identity), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *In re Gen. Motors Class E Stock Buyout Sec. Litig.*, 694 F.Supp. 1119, 1128 (D.Del.1988) ("Because this decision [to sell a subsidiary] was made solely by management and there were no negotiations ... until that fall, the transaction was not highly probable in the summer.").

Moreover, a takeover may remain improbable even though the parties have commenced negotiations, depending upon the status of their talks. In *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 244 (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989), for example, the Fourth Circuit reversed a jury verdict, finding that merger negotiations were immaterial even though representatives from the two banking companies had discussed a possible merger and agreed in principle to merge when interstate banking became legal. The Court stated:

[T]he discussions at issue here were preliminary, contingent, and speculative. At best, the merger discussions culminated in a vague "agreement" to establish a relationship. There was no agreement as to the price and structure of the deal. While, after *Basic*, this alone is not dispositive of the question of materiality, it is certainly not irrelevant to the totality of the circumstances test articulated in that case.

*Id.* at 244. Similarly, in *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir.1972), the Second Circuit upheld a jury verdict finding no materiality notwithstanding that the company had resolved to merge with a larger firm, it had contacted the potential acquirer, officers from the two companies had met, and the companies had exchanged nonpublic information regarding projections. The Court noted: "During the month of August terms for the exchange of corporate stock were discussed, but there is evidence that it appeared to the parties that they were so far apart that agreement could not be reached." *Id.* at 883.

Also relevant to assessing probability is whether the merger is contingent upon factors beyond the defendant's control. In *Taylor*, for example, the Fourth Circuit found insufficient probability to render the merger talks material, noting:

A merger between First Union and Southern was contingent on events beyond the control of the parties. At the time First Union purchased plaintiff's stock, the Supreme Court had yet to rule on the constitutionality of interstate banking, and no merger could take place until enabling legislation was enacted both in North Carolina and South Carolina.

857 F.2d at 244. Significantly, the Second Circuit prior to *Basic* relied upon this factor to distinguish between those cases in which merger negotiations were immaterial as a matter of law and those cases in which a fact-specific inquiry was appropriate. In *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988), Trans World Airlines, Inc. ("TWA") —a wholly owned subsidiary of Transworld Corporation ("TWC")—had issued cumulative preferred stock without disclosing that TWC had retained an investment bank to consider "structural and financial alternatives" (including selling or spinning off TWA), and the investment bank had discussed the possibility with TWC's executives. Reversing the trial court's grant of summary judgment dismissing the complaint, the Court stated:

The defendants at bar were in control of the timing of the TWA issue and of the response to the Odyssey proposal to a far greater degree than were the corporate defendants in the preliminary merger cases of the events unfolding there as a result of negotiations with outside parties. Here, we see no reason to carve out the policy exception recognized by cases such as *Staffin, Reiss* and *Flamm* to the *Northway* and *Texas Gulf Sulphur* formulations of materiality.

*Id.* at 735.

A court assessing a transaction's probability must consider "the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed." *In re Gen. Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1127 (D.Del.1988); *accord Reiss v. Pan Am. World Airways, Inc.,* 711 F.2d 11, 13 (2d Cir.1983) (stating that courts must view a claim that disclosure was necessary to make another statement not misleading " 'in the light of the facts existing at the time of the release....' ").

■ Having considered the probability that a takeover will occur, the court next must appraise the transaction's magnitude. A possible merger of course is a momentous occurrence for any corporation. *See Basic,* 108 S.Ct. at 987 (" 'a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death' ") (quoting *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47 (2d Cir.1976) (Friendly, J.)). However, information does not become material simply because it relates to a sale or merger. *See, e.g., General Motors,* 694 F.Supp. at 1128

("The substantial impact of the transaction ... must be balanced against the very low probability as of the summer of 1986 that it would occur. Although a close question, I conclude a reasonable investor would not consider GM's management's proposed, indefinite plan to be significant ... [so it] is not a material fact within the meaning of Rule 10b–5."). In *Basic, Inc. v. Levinson*, the Supreme Court suggested that a court assessing a transaction's magnitude consider "such facts as the size of the two corporate entities and of the potential premiums over market value." 485 U.S. 224, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988).

Beyond the probability that a takeover will occur and its anticipated magnitude, a court can consider additional factors for assessing the materiality of information relating to a possible takeover. *See Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 244 (4th Cir.1988) ("The materiality of merger discussions depends upon the surrounding facts and circumstances.") (citing *Basic*, 108 S.Ct. at 987–88), *cert. denied*, —— U.S. ——, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989).

For example, the fact that information was in the public domain and accessible to the plaintiff would militate against a finding of materiality. The Supreme Court's definition of materiality requires that the undisclosed facts would have " 'significantly altered the "total mix" of information made available.' " *Basic*, 108 S.Ct. at 983 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132). A defendant's disclosure of facts readily accessible to the public and the plaintiff would not likely alter the "total mix" of information available. *See Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir.1989) ("Given this general knowledge, the release of the information Jackvony cites ... could have added nothing significant."); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1235 (7th Cir.1988) ("Having sufficient information to call a representation into question may preclude an investor from later claiming that the representation was material.") (citations omitted) (dicta); Rosenfeld & Wadsworth, *Materiality After Basic, Inc. v. Levinson*, 1989 PLI Sec. Litig. 297 ("inside informa-tion that matches expectations or public information is likely not to be material").

■ However, although public knowledge regarding undisclosed facts is a factor to address when considering the totality of the circumstances, a court should not place too much weight on this element. As the Second Circuit has noted: "There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." *Kronfeld*, 832 F.2d at 736 (citing *Spielman v. Gen'l Host Corp.*, 538 F.2d 39, 40–41 (2d Cir.1976) (per curiam); *Fisher v. Plessey Co.*, 559 F.Supp. 442, 445–48 (S.D.N.Y. 1983)).

In *Basic*, the Supreme Court stated that "trading (and profit making) by insiders can serve as *an* indication of materiality," although it declined to find that insider trading by definition establishes materiality. 108 S.Ct. at 988 n. 18 (emphasis in original). The relevance of insider trading for assessing information's significance to a reasonable investor is self-evident. In a case involving an SEC enforcement action against an insider who bought shares knowing the company was attempting to arrange a merger, the Second Circuit noted:

> But we need not merely speculate as to how a reasonable investor might have received this information. The behavior of the appellant, his partner Shapiro, and others who knew of the merger, all of whom were sophisticated investors, demonstrates empirically that the information was material.

*SEC v. Shapiro*, 494 F.2d 1301, 1307 (2d Cir.1974); *see also SEC v. Geon Indus., Inc.*, 531 F.2d 39, 48 (2d Cir.1976) ("Both Rauch and Alpert demonstrated the importance they attached to the information by purchasing shares in mid-October."); *SEC v. Ingram*, 694 F.Supp. 1437, 1441 (C.D. Cal.1988) ("the fact that significant purchases were made after years of only mar-

ginal trading indicates that the information was material").

Where appropriate, courts assessing the materiality of nonpublic information also can consider what actually transpired following disclosure. *See, e.g., Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 736 (2d Cir.1987) ("when TWC announced ... that it was 'considering the possible separation of TWA,' the price of TWA's common stock went into an immediate and sharp decline"), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988); *cf. Detwiler v. Offenbecher,* No. 86 Civ. 7150 (RWS), slip op. at 86, 1989 WL 107939 (S.D.N.Y. Aug. 16, 1989) ("In assessing the reasonableness of the method of preparing forecasts, evidence regarding the circumstances at the time is important. However, courts also have considered actual results, particularly where those results proved exculpatory.") (citations omitted).

Again, however, a court should not place too much weight on this consideration. According to the Second Circuit, "hindsight is of limited value and the fact that the ultimate disclosure of the negotiations affected stock price is not compelling." *Reiss,* 711 F.2d at 13.

■ In this action, the Plaintiffs allege that Federated failed to disclose several "facts," including that the company was a potential takeover candidate, that it had plans in place to address an acquisition proposal, that a takeover could disrupt the company's financial stability and long-term plans, and that a highly-leveraged acquisition could convert the Notes to "junk" with increased risk and reduced market value. They also contend that Federated's board should have revealed the circumstances under which it was prepared to approve a highly leveraged acquisition. Applying the factors discussed above, no reasonable jury could find that these purported "facts" were material.

When the Plaintiffs bought the Notes, the probability of another company ac-

quiring Federated was extremely low. Federated was widely rumored as a possible takeover candidate, but the company had not identified a potential acquirer, and no suitor had contacted Federated or made an offer to buy the company. Nor had Federated indicated any interest in being acquired—there were no board resolutions, instructions to investment bankers, contacts with lawyers, or negotiations with another company. Indeed, by instituting a shareholder rights plan and repurchasing large blocks of its stock, Federated had demonstrated that it had little desire to be taken over. Furthermore, because Federated was not pursuing a sale or merger, any takeover that might transpire remained beyond its control—in the hands of a hypothetical acquirer.

The Plaintiffs' allegation that Federated failed to disclose that Goldfeder was "considering" an LBO fares no better under this analysis.[5] Although the *Wall Street Journal* article indicated that Goldfeder had attempted to arrange financing and solicit support, his efforts proved unavailing and no bid—or negotiations with Federated—resulted. There are no allegations that Federated participated in this attempt, through board resolutions, instructions to investment bankers, or similar actions. *See Savage v. Federated Dep't Stores, Inc.,* No. 88–4444, slip op. at 27 (D.N.J. May 2, 1989).

Moreover, when the Plaintiffs purchased the Notes the magnitude of the transaction could not be assessed. Absent even an indication of interest—never mind a formal offer or some progress toward the deal's price and structure—Federated had no way to appraise the size of the two corporate entities or the potential premiums over market price.

In addition, disclosure that Federated was an "attractive" takeover candidate, that management recognized the company might receive offers, or that an acquisition—particularly a highly leveraged one—

---

5. Although the Plaintiffs raise the Goldfeder LBO as an issue in their papers in opposition to the motions, the allegation appears nowhere in the complaint or amended complaint. A "claim

for relief may not be amended by the briefs in opposition to a motion to dismiss." *Teletronics Proprietary Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 836 (S.D.N.Y.1988).

could transform the company's financial structure and long-term outlook would not have altered the "total mix" of information available to investors. For several years before Federated issued the Notes, reports in the press and financial community had identified Federated as "one of the more attractive takeover possibilities" and as a "frequently mentioned" acquisition target. Articles also had appeared detailing the risks takeovers posed for those holding investment grade securities, such as the Notes. For example, *Business Week* noted in November 1985 that "investors are beginning to view the debt securities of high-grade industrial corporations as some of Wall Street's riskiest investments. Owners of high-grade corporates face substantial losses from takeovers." Similarly, *The New York Times* reported in January 1986 that "[f]ears that what may be a high-quality, investment-grade bond one day may turn into a low- or speculative-grade bond the next have sent investors flying from industrial bonds in general into safer utility, Treasury and government agency issues."

The Plaintiffs urge the court to find materiality based upon what actually transpired, arguing that "Defendants strain credulity in urging that purchasers would not have cared about a transaction that caused the price of its bonds to fall by 18% and destroy $36,000,000 in value. Indeed, the decline in the value of the Notes is itself evidence of the materiality of the omissions." Hartford Mem. in Opp. at 33 (citing *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2d Cir.1988), *cert. denied*, 487 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988)). However, *Kronfeld* involved the market's response to an announcement that TWC was *"considering* the possible separation of TWA," its wholly owned subsidiary. *Id.* at 736 (emphasis added). Here, the Plaintiffs urge the court to assess materiality with the 20/20 hindsight afforded by a completed takeover with the price, terms, and market impact fully revealed. That logic strains *Kronfeld* beyond recognition.

Perhaps a better indication in this case of the requested disclosure's actual impor-

tance to investors is the public information available to the Plaintiffs when they bought the Notes. Those facts more closely resemble TWC's announcement in *Kronfeld* that it was "considering" separating TWA. Yet despite reports in the press and financial community that identified Federated as an "attractive" takeover candidate and detailed the detrimental effect takeovers had on investment grade securities, the Plaintiffs invested millions of dollars in the Notes. Evidently, this information was of little importance at the time.

The First Circuit recently decided a case that virtually is "on all fours" with this action, finding the alleged nondisclosures immaterial as a matter of law. In *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411 (1st Cir.1989), the Rhode Island Hospital Trust Bank ("Hospital Trust") had acquired the Columbus National Bank ("Columbus") in a tender offer allowing Columbus's shareholders to choose $25 cash or $25 in Hospital Trust stock for each Columbus share (five Hospital Trust shares for six Columbus shares). Little more than a year later, Hospital Trust agreed to be acquired by Bank of Boston for $73 per share. Jackvony, a major Columbus shareholder, sued Hospital Trust under Rule 10b–5 and state common law fraud, alleging that Hospital Trust had made misleading statements and failed to disclose material facts that caused him to exchange his Columbus shares for more cash and fewer Hospital Trust shares than he otherwise would have done.

The case proceeded to trial, and Jackvony offered evidence that Hospital Trust's senior executives and its Planning Committee knew at the time it acquired Columbus that Hospital Trust was "an attractive takeover candidate by a foreign bank," that there existed a possibility of the bank "being acquired," and that the bank was an "attractive target." Jackvony also established that—prior to the Columbus acquisition—at least three other banks had approached Hospital Trust about a potential "affiliation," that the bank had "consider[ed]" whether to take "protective policies against takeovers," and that its General Counsel had made "a broad review ... of

the legal considerations" if the bank "should ... become a takeover target" and had recommended acquiring outside services "relating to mergers and acquisitions." *Id.* at 413–14.

Jackvony argued that Hospital Trust had defrauded him by failing to disclose these facts when it bought his Columbus shares. The trial court granted a directed verdict in Hospital Trust's favor, concluding that no reasonable juror could find fraud based upon the evidence Jackvony had presented.

The First Circuit, per the Honorable Stephen G. Breyer, affirmed the directed verdict, stating: "[W]hen we return to the evidence, we find that Jackvony cannot prevail under either state or federal 'antifraud' law. He cannot show that Hospital Trust failed to disclose information that was *'material.'* " *Id.* at 415. Judge Breyer's explanation for concluding that no reasonable juror could find the omitted facts material—as the Supreme Court defined that concept in *TSC Industries* and *Basic*—is worth quoting at length:

> For one thing, the evidence shows no more than the type of concern about possible acquisition that many large companies frequently express; it reveals no concrete offers, specific discussions, or anything more than vague expressions of interest. It provides no reason to believe in the existence of any preliminary negotiations of the sort mentioned in *Basic*, a case in which the Supreme Court found that specific "meetings and telephone conversations" among "officers and directors" of the relevant firms "concerning the possibility of a merger" might, or *might not*, prove material, depending upon the "probability that the transaction will be consummated." *Basic*, 108 S.Ct. at 993. Any reasonably sophisticated investor in securities buying shares in a large corporation would expect that, from time to time, other corporations might express an interest in buying, or that the large corporation's directors might discuss what it should do if it obtains such offers. For large corporations to make public announcements every time directors discuss any such matter in terms as vague as those

> presented in this evidence or receive "tentative feelers" of the general sort revealed by this evidence ... would more likely confuse, than inform, the marketplace.

> For another thing, the record contains other evidence making clear that in 1982 the banking community believed that the banking laws would soon change; that previously forbidden interstate bank expansion would soon become permissible; that many regional banks were considering expansion; and that consequently some New England banks might acquire others. Given this general knowledge, the release of the information Jackvony cites ... could have added nothing significant.

*Id.* at 415 (emphasis in original).

The Plaintiffs contend that *Basic*'s fact-specific approach to materiality renders summary judgment inappropriate, arguing that "[w]hat a reasonable investor would consider important is, like so many other issues involving reasonableness, almost always a question of fact for the jury." Hartford Mem. in Opp. at 32.

However, the Supreme Court in *Basic* implicitly recognized the propriety of summary judgment where a prospective merger is too inchoate to be material. Stating that "[t]he fact-specific inquiry we endorse here is consistent with the approach a number of courts have taken in assessing the materiality of merger negotiations," *Basic*, 108 S.Ct. at 988, the Court cited several cases, including *Berman v. Gerber Products Company*, 454 F.Supp. 1310, 1316, 1318 (W.D.Mich.1978). In *Berman*, Anderson, Clayton & Company had made a tender offer for Gerber Products Company ("Gerber"). When the Gerber board issued a press release recommending that Gerber shareholders reject the tender offer, it failed to disclose that another company—Unilever, Ltd.—had approached Gerber about a friendly acquisition. Gerber shareholders sued, alleging that the company's failure to disclose violated section 14(e) of the Exchange Act. The court granted summary judgment dismissing the complaint, stating: "because such overtures

were not firm offers they should not be deemed material information required to be disclosed under § 14(e).... 'Parties are not required to disclose plans which are contingent or indefinite.'" *Id.* at 1318 (quoting *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388, 398 (8th Cir.1976)) (citations omitted).[6]

Since *Basic,* other courts have concluded that preliminary merger negotiations were too incipient for a jury to find them material. In affirming the directed verdict dismissing the complaint in *Jackvony,* for example, the First Circuit applied a standard of review almost identical to the standard for summary judgment. *Compare Jackvony,* 873 F.2d at 413 ("In order to uphold grant of directed verdict we must find that, viewing the evidence in the light most favorable to the non-moving party, reasonable jurors could come but to one conclusion.") (quoting *Goldstein v. Kelleher,* 728 F.2d 32, 39 (1st Cir.), *cert. denied,* 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)) *with Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (summary judgment is permissible only where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party"); *see also Taylor v. First Union Corp. of South Carolina,* 857 F.2d 240 (4th Cir. 1988) (reversing a jury verdict imposing liability for failure to disclose under Rule 10b–5 where representatives had met to discuss the possibility of the two banking corporations merging and had reached an

agreement in principle to merge when interstate banking became legal), *cert. denied,* —— U.S. ——, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989); *Savage v. Federated Dep't Stores, Inc.,* No. 88–4444, slip op. at 27 (D.N.J. May 2, 1989) (granting summary judgment dismissing Rule 10b–5 action by Federated employees who sold their shares three months before CRTF announced its bid); *In re Gen. Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119 (D.Del.1988) (granting motion to dismiss Rule 10b–5 claim relating to a company's failure to disclose plans to sell a subsidiary during the time when the company had resolved to sell the subsidiary but had not begun talks with a potential acquiror).

Because no reasonable jury could find that the facts Federated allegedly failed to disclose when it issued the Notes were material, summary judgment is granted dismissing the Plaintiffs' securities law, fraud, and negligent misrepresentation claims.

### D. Implied Covenant of Good Faith and Fair Dealing

The Plaintiffs also have alleged that the Defendants breached an implied covenant of good faith and fair dealing in the Debenture. Hartford Amended Complaint ¶¶ 49–55; Segal Complaint ¶¶ 49–52. The Plaintiffs contend that Federated's actions and representations convinced them that they were buying "conservative, low-risk notes in a financially sound and secure company with a strong commitment to

---

**6.** The Supreme Court also noted its approval of *Susquehanna Corp. v. Pan American Sulphur Company,* 423 F.2d 1075, 1084–85 (5th Cir.1970). In that case, the Susquehanna Corporation ("Susquehanna") had made a tender offer for Pan American Sulphur Company ("Pan American") shares and filed a Schedule 13D statement saying: "Susquehanna does not plan or propose to liquidate Pan American, to sell its assets to, or merge it with, any other person, or to make any other major change in its business or corporate structure." When the company issued this statement, Susquehanna's President had discussed a possible merger with Pan American's President and sent a telegram to the American Smelting and Refining Company ("ASARCO") proposing a Pan American–ASARCO merger and stating the possible terms. ASARCO never acknowledged the proposal, and two days later

Pan American denied that it had authorized the offer. Holding that the Schedule 13D statement was not misleading because the merger was too premature to be material, the Court of Appeals reversed the trial court's injunction and dismissed the complaint, saying:

> It would have been misleading to the stockholders and to the public investor for Susquehanna's Schedule 13D, Item 4 answer ... to indicate that there was a plan or proposal to merge [Pan American] with ASARCO. The idea for such a merger never got off the ground. It subsisted for a mere two days when [Pan American's] management repudiated it. It was not a plan or proposal required to be included in the Schedule 13D statements.

*Id.* at 1085.

long-term growth and profitability." Federated Mem. in Opp. at 37. According to the Plaintiffs, Federated "breached its duty of good faith and fair dealing by, among other things, entering into a transaction that prejudiced the security underlying the Notes, impaired Federated's ability to pay the interest and principal on the Notes, and expropriated the value of the Notes for itself and the holders of its securities." Hartford Amended Complaint ¶ 54; *accord* Segal Complaint ¶ 51.

Every contract governed by New York law—including the Indenture (§ 14.04)—contains an implied covenant to perform the contract fairly and in good faith. *See Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 385 N.E.2d 566, 569, 412 N.Y.S.2d 827, 830 (1978). This implied covenant means that " 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1383–85 (2d Cir.) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975); *see also Broad v. Rockwell Int'l Corp.*, 642 F.2d 929 (5th Cir.) ("The covenant is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other.") (applying New York law), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

However, the implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract. *See, e.g., Gardner & Florence Call Cowles Found. v. Empire, Inc.*, 589 F.Supp. 669, 673 (S.D.N.Y.1984) (an "implied covenant ... derives its substance directly from the language of the Indenture, and 'cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture' ") (quoting *Broad*, 642 F.2d at 957), *vacated for lack of subject matter jurisdiction*, 754 F.2d 478, 479 (2d Cir.1985); *Burr v. Stenton*, 43

N.Y. 462, 464 (1871) ("where the instrument contains an express covenant in regard to any subject, no covenants are to be implied in respect to the same subject"). In addition, "[t]he mere exercise of one's contractual rights, without more, cannot constitute ... a breach [of the implied covenant of good faith and fair dealing]." *Broad*, 642 F.2d at 957. Nor can a court imply a covenant to supply additional terms for which the parties did not bargain. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1519 (S.D.N.Y. 1989) ("These plaintiffs do not invoke an implied covenant of good faith to protect legitimate, mutually contemplated benefit of the indentures; rather, they seek to have this Court create an additional benefit for which they did not bargain.").

The argument the Plaintiffs urge on this court violates each of these strictures. The Indenture expressly authorized Federated to merge with another company and to incur additional debt. Under the heading "Consolidation, Merger, Sale, or Conveyance," the Indenture provided: "Nothing contained in this Indenture or in any of the Securities shall prevent any consolidation or merger of the Company with or into any other corporation...." Indenture § 11.01. The Indenture conditioned this right in three respects:

(a) immediately after such consolidation, merger, sale or conveyance the corporation (whether the Company or such other corporation) formed by or surviving any such consolidation or merger, or to which such sale or conveyance shall have been made, shall not be in default in the performance or observance of any of the terms, covenants and conditions of this Indenture to be kept or performed by the Company; (b) the corporation (if other than the Company) formed by or surviving any such consolidation or merger, or to which such sale or conveyance shall have been made, shall be a corporation organized under the laws of the United States of America or any state thereof; and (c) the due and punctual payment of the principal of, and premium (if any) and interest, if any, on all of the Securities, according to their tenor, and the due and

punctual performance and observance of all the covenants and conditions of this Indenture to be performed, or observed by the Company, shall be expressly assumed, by supplemental indenture, satisfactory in form to the Trustee, executed and delivered to the Trustee by the corporation (if other than the Company) formed by such consolidation, or into which the Company shall have been merged, or by the corporation which shall have acquired such property.

*Id.* The Indenture then reiterated: "Nothing contained in this Indenture or in any of the Securities shall prevent the Company from merging into itself any other corporation (whether or not affiliated with the Company)." Indenture § 11.02. The Indenture also expressly permitted Federated to incur additional debt, provided it secured the Notes "equally and ratably" with any new debt guaranteed by Federated's assets. Indenture § 4.05.

An implied covenant prohibiting Federated from merging with CRTF or incurring additional debt for that purpose would directly contravene these provisions and penalize Federated for exercising its rights under the Indenture. The Plaintiffs counter that this language applies to a "traditional merger," Hartford Mem. in Opp. at 44, and to "debt in the ordinary course of business, for the purpose of expanding, developing and strengthening its business." *Id.*

However, nothing in the Indenture supports this distinction between "good" and "bad" mergers or "ordinary" and "extraordinary" debt. Moreover, permitting courts to weigh the virtues of such transactions on a case-by-case basis threatens to inject an impermissible degree of uncertainty into the bond market. *Cf. Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir.1982) ("Uniformity in interpretation is important to the efficiency of capital markets.... [T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets."), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983); *Broad v.*

*Rockwell Int'l Corp.*, 642 F.2d 929, 943 (5th Cir.1981) ("Not the least among the parties 'who must comply with or refer to the indenture' are the members of the investing public and their investment advisors. A large degree of uniformity in the language of debenture indentures is essential to the effective functioning of the financial markets: uniformity of the indentures that govern competing debenture issues is what makes it possible meaningfully to compare one debenture issue with another, focusing only on the business provisions of the issue...."), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

Implying a term barring Federated's merger with CRTF also would require the court to add a substantive provision for which the parties did not bargain. That is especially troublesome in light of the fact that the Indenture could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this court to imply. For example, the Indenture could have barred mergers altogether, permitted the Noteholders to participate in a tender offer by making the Notes convertible into stock, or required the Notes to be redeemed in the event of a takeover. It also could have restricted the amount of additional debt Federated could incur or imposed ceilings on the ratios of debt to equity, debt to assets, or earnings to fixed charges. *See* American Bar Association, *Commentaries on Model Debenture Indenture Provisions* at 371.

The fact that these terms appeared nowhere in the Indenture does not mean the court now should imply them to protect the parties' bargain. In fact the opposite appears to be true. Because the risk of a takeover—and the indenture provisions available to limit that risk—were well-known, to imply such provisions could impose on the parties terms they affirmatively excluded from their contract. It also could have broader ramifications. As Judge Walker recently observed:

The sort of unbounded and one-sided elasticity urged by plaintiffs would interfere with and destabilize the market.

And this Court, like the parties to these contracts, cannot ignore or disavow the marketplace in which the contract is performed. Nor can it ignore the expectations of that market—expectations, for instance, that the terms of an indenture will be upheld, and that a court will not, *sua sponte*, add new substantive terms to that indenture as it sees fit. The Court has no reason to believe that the market, in evaluating bonds such as those at issue here, did not discount for the possibility that any company, even one the size of RJR Nabisco, might engage in an LBO heavily financed by debt.

*Metropolitan Life*, 716 F.Supp. at 1520.

Accordingly, summary judgment is granted dismissing the Plaintiffs' causes of action for breach of an implied covenant of good faith and fair dealing.

### E. Promissory Estoppel

The Plaintiffs have sued for promissory estoppel, alleging that Federated's representations regarding its financial stability and long-term outlook induced the Plaintiffs to buy the Notes. According to the Plaintiffs, they suffered harm when the CRTF acquisition reduced the value of the Notes. *See* Hartford Amended Complaint ¶¶ 56-60; Segal Complaint ¶¶ 56-58.

To state a cause of action for promissory estoppel, the Plaintiffs must allege " 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.' " *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir.1984) (quoting *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 122, 452 N.Y.S.2d 447, 449 (2d Dep't), *appeal denied*, 57 N.Y.2d 609, 442 N.E.2d 1277, 456 N.Y.S.2d 1026 (1982)); *Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 47-48 (2d Cir.1988). Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract. *See generally* E. Farnsworth, *Contracts*, § 2.19 at 89-98 (1982).

■ Although the Plaintiffs claim to have relied to their detriment on Federated's alleged representations that it would not "repudiate all its promises and ... approve a highly leveraged transaction that would destroy the value of the Notes," Hartford Memo in Opp. at 48, the Indenture expressly permitted Federated to merge with another company and incur additional debt. *See* §§ 11.01, 11.02, 4.05. Faced with a comprehensive contract—the Indenture—authorizing Federated's conduct, the Plaintiffs cannot invoke promissory estoppel to avoid its enforcement. *See Callahan v. American Motorists Ins. Co.*, 56 Misc.2d 734, 737, 289 N.Y.S.2d 1005, 1009 (N.Y.Sup.Ct.1968) ("Estoppel will not ... serve to extend the coverage afforded by American's policy beyond what it contracted for"); *Orcutt v. Tucson Warehouse & Transfer Co.*, 83 Ariz. 200, 318 P.2d 671, 674 (1957) (a court may not write a new contract for the parties by estoppel), *cited with approval, Ayer v. Board of Educ.*, 69 Misc.2d 696, 700, 330 N.Y.S.2d 465, 468-69 (N.Y.Sup.Ct.1972). Indeed, applying promissory estoppel to create contractual obligations where a comprehensive contract exists would contravene the fundamental rules that extrinsic evidence cannot be used to vary the unambiguous terms of a contract, *see Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 396 N.E.2d 1029, 1031, 421 N.Y.S.2d 556, 559 (1979), and that obligations inconsistent with the terms of a contract cannot be implied. *See Neuman v. Pike*, 591 F.2d 191, 194 (2d Cir.1979); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

Thus, the Plaintiffs' claims for promissory estoppel are dismissed.

### F. Mistake

■ Hartford seeks rescission, alleging that "[a]t the time the Indenture and the Notes were entered into, one or both parties were mistaken as to a basic assumption on which the parties' agreement was based," Hartford Amended Complaint ¶ 62, and that "[t]he true state of facts repre-

sents a fundamental change in circumstances and frustrates the purpose of [Hartford] in agreeing to purchase the Notes, such that enforcement of the agreement would be unconscionable." *Id.* at ¶ 63.

Under New York law, rescission is available only where " 'a mistake of both parties at the time [the] contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances.' " *See Gerard v. Almouli*, 746 F.2d 936, 938 & n. 2 (2d Cir.1984) (quoting *Restatement (Second) of Contracts* § 152(1)). Hartford cannot meet these requirements.

First, there was no mistake regarding facts as they existed when Hartford bought the Notes. The only "mistake" was a failure to anticipate Federated's future merger with CRTF. However, a "party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here." *Restatement (Second) of Contracts* § 151 comment (a); *see also Leasco Corp. v. Taussig*, 473 F.2d 777, 781–82 (2d Cir.1972) (estimate that corporation would earn $200,000 is insufficient) (citing *Backus v. MacLaury*, 278 A.D. 504, 106 N.Y. S.2d 401 (4th Dep't), *appeal denied*, 278 A.D. 1043, 107 N.Y.S.2d 568 (4th Dep't 1951)); *Gerard v. Almouli*, 746 F.2d at 939; *Wooldridge v. Exxon Corp.*, 39 Conn. Supp. 190, 473 A.2d 1254, 1257 (Conn.Super.1984) ("changes in economic conditions are always at risk in business agreements.... Future market predictions are not the sort of mutual mistake that will support the remedy of rescission"); *Raphael v. Booth Memorial Hosp.*, 67 A.D.2d 702, 703, 412 N.Y.S.2d 409, 411 (2d Dep't 1979) ("Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain.").

Moreover, it could not have been a "basic assumption" that Federated would not be acquired or that it would incur additional debt in the process. The Indenture expressly contemplated the possibility of a merger (§§ 11.01, 11.02), and the press and financial markets had speculated about it for years. The Indenture also expressly authorized Federated to incur additional debt. § 4.05.

Accordingly, Hartford's claim for mistake is dismissed.

### G. Unjust Enrichment

■ Hartford seeks recovery for unjust enrichment, contending that the Defendants have "expropriated [Hartford's] investment in investment-grade Federated bonds, directly enriching themselves and their stockholders at [Hartford's] expense." Hartford Amended Complaint ¶ 74.

To state a claim for unjust enrichment, Hartford must allege "that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir.1983). Unjust enrichment is designed "to prevent one person who has obtained a benefit from another without ever entering into a contract with that person from unjustly enriching himself at the other person's expense." *Chadirjian v. Kanian*, 123 A.D.2d 596, 598, 506 N.Y.S.2d 880, 882 (2d Dep't 1986). Where, as here, there is an express contract governing the subject matter that was not breached, there can be no unjust enrichment. *See Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 516 N.E.2d 190, 198, 521 N.Y.S.2d 653, 656 (1987); *Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir.1988); *Chadirjian*, 123 A.D.2d at 598, 506 N.Y.S.2d at 882; *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 655 F.Supp. 1281, 1289 (S.D.N.Y.1987), *aff'd*, 838 F.2d 66 (2d Cir.1988).

Thus, Hartford's claim for unjust enrichment is dismissed.

### H. Tortious Interference With Contractual Relations

■ The Plaintiffs have sued Campeau Canada, Campeau U.S., and CRTF for tortious interference with contractual rela-

tions. Hartford Amended Complaint ¶¶ 66–68; Segal Complaint ¶¶ 59–61. According to the Plaintiffs, these defendants "knew of the existing contractual relationship between [the Plaintiffs] and Federated under the Indenture and the Notes, and intentionally interfered with that relationship without justification in an effort to expropriate to themselves the benefit of the relationship." Hartford Amended Complaint ¶ 67; *accord* Segal Complaint ¶ 60.

A cause of action for tortious interference with contractual relations requires: "(1) the existence of a valid contract ... (2) the defendant's knowledge of that contract, (3) the defendant's intentional procuring of the *breach* of that contract ... and (4) damages." *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99, 151 N.Y.S.2d 1, 4 (1956) (emphasis added); *accord Kaminski v. United Parcel Serv.*, 120 A.D.2d 409, 412–13, 501 N.Y.S.2d 871, 873 (1st Dep't 1986).

As discussed above, the Plaintiffs can allege no breach of contract underlying their claim for tortious interference with contractual relations. The Plaintiffs contend that they can state a claim for tortious interference absent a breach of contract, however, where "performance of the contract is rendered more difficult or a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions." *Maison Lazard Et Compagnie v. Manfra, Tordella & Brooks, Inc.*, 585 F.Supp. 1286, 1290 (S.D.N.Y.1984) (citing *Goodall v. Columbia Ventures, Inc.*, 374 F.Supp. 1324, 1332 (S.D.N.Y.1974)).

However, the New York Court of Appeals has said that "for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party," *Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 364 N.E.2d 1119, 396 N.Y.S.2d 347, 349 (1977), and courts repeatedly have dismissed claims of tortious interference with contractual relations on that ground. *See, e.g., Penthouse Int'l, Ltd. v. Koch*, 599 F.Supp. 1338, 1343 (S.D.N.Y.1984); *Beacon Syracuse Assocs.*

*v. Syracuse*, 560 F.Supp. 188, 202 (N.D.N.Y.1983); *Estate of Roth v. Erhal Holding Corp.*, 141 A.D.2d 693, 696, 529 N.Y.S.2d 815, 817 (2d Dep't 1988); *Ford v. Sidney*, 139 A.D.2d 848, 850, 527 N.Y.S.2d 582, 584 (3d Dept.1988); *Gregoris Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 80 A.D.2d 631, 631–32, 436 N.Y.S.2d 90, 91 (2d Dep't), *aff'd*, 54 N.Y.2d 634, 425 N.E.2d 893, 442 N.Y.S.2d 505 (1981); *Davis v. Williams*, 59 A.D.2d 660, 661, 398 N.Y.S.2d 281, 282 (1st Dep't 1977), *aff'd*, 44 N.Y.2d 882, 379 N.E.2d 158, 407 N.Y.S.2d 630 (1978); *International Bureau for Protection & Investigation, Ltd. v. Public Serv. Employees Union No. 80*, 98 Misc.2d 409, 421, 413 N.Y.S.2d 962, 969 (N.Y.Sup.Ct.1979).

Accordingly, the Plaintiffs' claims for tortious interference with contractual relations are dismissed.

*Conclusion*

For the reasons set forth above, the motions are granted and Hartford's amended complaint and Segal's complaint are dismissed in their entirety. Submit judgments on notice.

It is so ordered.