**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

**v.**

**Harris A. SHAPIRO et al., Defendants,**

**Norman Berman, Defendant-Appellant.**

**Nos. 377, 695**
**Dockets 72–1927, 73–1120.**

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1974.

Decided April 9, 1974.

David Ferber, Sol., Securities and Exchange Commission (Lawrence E. Nerheim, Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, and Frederic T. Spindel, Securities and Exchange Commission, on the brief), for plaintiff-appellee.

Milton S. Gould, New York City (Ronald H. Alenstein, Lois S. Yohonn, and Shea, Gould, Climenko & Kramer, New York City, on the brief), for defendant-appellant.

Before HAYS, MANSFIELD and OAKES, Circuit Judges.

HAYS, Circuit Judge:

The Securities and Exchange Commission brought this action against defendants Shapiro, Berman and others [1] for violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and the Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5. The district court, finding that violations had been committed, enjoined defendants from further violations of section 10(b) and Rule 10b–5 and ordered defendants to surrender their profits to a trustee. 349 F.Supp. 46 (S.D.N.Y.1972). Defendant Berman brought this appeal.

We affirm.

I.

Shapiro and Berman were partners in a firm which specialized in arranging corporate mergers and acquisitions. In October 1970 they commenced efforts on behalf of Ridge Manor Development

1. Defendants Unschuld, Kaplan, Frederick Robinson, Elliot Robinson, Zises, Rosenbloom, and Rothberg consented to injunctions against them and to disgorgement of profits from their transactions in Harvey's stock.

Corporation to arrange a merger with Harvey's Stores, Inc. On December 11, 1970, Harvey's rejected their proposal in a letter to Joel Friedland, president and major shareholder of Ridge Manor, from William Richter, chairman of the board of Harvey's.

Later in the month Shapiro and Friedland met and again discussed a merger with Harvey's. Friedland supplied Shaprio with unaudited financial data concerning Ridge Manor's earnings for the outgoing year. With these figures Shapiro and Berman prepared a pro forma consolidated financial statement showing a sharp increase in Harvey's earnings if the two firms merged. In order to alleviate fears expressed by some of Harvey's officials, Shapiro and Berman also collected data concerning the price-earnings multiples of several land development companies.

On January 6, 1971, Friedland, Shapiro, and Berman met with David Rosenbloom, a director of Harvey's and a personal friend of Shapiro and Berman, and presented him with these data in an attempt to rekindle merger talks. Rosenbloom stated that certain of Harvey's officials opposed the merger, but that he viewed the merger favorably. He agreed to raise the issue again with the other members of Harvey's board.

After the meeting Berman purchased Harvey's stock for the first time, buying 100 shares at 7¼.

Rosenbloom's efforts apparently succeeded, for Richter and Gerald Cohen, the two members of Harvey's merger and acquisition team, agreed to meet Shapiro and Berman on January 21 to discuss terms of a possible merger. On January 25 Harvey's executive committee met and drafted a letter setting down Harvey's terms for the proposed merger. One term insisted upon was the purchase of at least 200,000 shares of restricted stock in Harvey's. The letter was delivered to Shapiro on the same day.

On January 25 Berman purchased 400 shares of Harvey's stock at prices ranging from 7⅛ to 7⅜.

On the morning of January 26 Shapiro and Berman met again with Richter and Cohen to discuss the terms stated by Harvey's in the January 25 letter. During and after the meeting Shapiro telephoned an acquaintance, Jay Zises, to discuss financing for the merger.

On the afternoon of January 26 Shapiro and Berman visited the office of Danard Unschuld, a New York stock broker and friend of Shapiro. Berman opened an account with Unschuld and purchased 400 shares of Harvey's at 8½. Berman testified that it was possible that during the discussion with Unschuld he mentioned the merger negotiations between Harvey's and Ridge Manor. On the next day Unschuld purchased 100 shares of Harvey's. Over the next two weeks Unschuld on several occasions bought Harvey's stock for his own account and for discretionary accounts controlled by him.

At the request of Zises, Berman arranged a meeting for January 28. At the meeting Shapiro and Zises discussed financing for the merger with Richter, Cohen, Rosenbloom, and Andrew Heine, of Harvey's executive committee. Zises requested an exclusive agency for 90 days for selling the restricted shares in Harvey's, during which time Harvey's would pursue no other mergers. The representatives of Harvey's rejected this proposal and left the meeting because at the time Harvey's was also discussing a merger with Liberty Circle Corporation. On the same day or the next day Liberty Circle accepted in principle a plan under which it would be acquired by Harvey's. During the following week Harvey's continued merger discussions with Liberty Circle without concluding an agreement.

Meanwhile, on January 28 Berman discussed with Frederick Robinson, a large shareholder in Harvey's, the purchase of some of Harvey's restricted stock. At least twice in the next two weeks Robinson purchased Harvey's stock.

On February 4 Harvey's executive committee again met with Shapiro and Berman and representatives of Ridge

Manor. At the meeting an updated pro forma consolidated balance sheet containing non-public information for the merged companies was circulated. The parties reached no final accord, but did agree on a public announcement that Harvey's was conducting merger negotiations with two unidentified companies. The announcement, made the next morning, was the first public disclosure of the merger discussions.

On February 5 Joel Friedland discussed with Maurice Wilkens, representative of an institutional investor, the purchase of Harvey's restricted stock. Later in the week he told Wilkens he expected the merger to be consummated within two or three weeks. Meanwhile Friedland continued discussions with Richter.

On February 8 Berman sold 600 shares of Harvey's stock at prices ranging from 18 to 18¾.

On February 9 Harvey's executive committee met with representatives of Ridge Manor. The parties drafted, without signing, a "letter of intent" incorporating the provisions of the proposed merger. They also agreed on a public announcement, released the next day, that Harvey's was conducting further negotiations with two companies and identifying Ridge Manor as one. On February 11 representatives of Harvey's and Ridge Manor met again to discuss details of the merger. Negotiations continued for the next several days.

On February 16 Berman purchased 500 shares and two calls on Harvey's stock at 22.

On February 18, in response to a request from the American Stock Exchange (AMEX), the parties issued four announcements which disclosed, respectively, that Harvey's and Ridge Manor had agreed in principle to merge, Ridge Manor's earnings for 1970, the expectation of a split in Harvey's stock after the merger, and that the merger was subject to AMEX approval.

After the third announcement Berman purchased 500 shares of Harvey's at between 23⅝ and 23¾.

In the middle of March the AMEX approved the merger, but by this time Friedland had begun to question the wisdom of the merger. On April 3 Harvey's agreed to merge with Liberty Circle. On April 5 Harvey's and Ridge Manor met again, but Friedland's dissatisfaction prompted Harvey's to withdraw from the deal.

On February 24 and March 8 and 9 Berman sold his entire holdings in Harvey's at prices ranging from 21 to 22½.

## II.

### A. *Violations of Section 10(b) and Rule 10b–5.*

The SEC claims that the foregoing facts establish violations of section 10(b) of the Securities Exchange Act and of the Commission's Rule 10b–5 in that Berman traded in the stock of Harvey's Stores while possessing material, non-public information about the company without disclosing that information to those with whom he traded.

Appellant concedes that he traded while in possession of information which did not become public until February 18. However, he denies that this information was material because the possibility of a merger was always remote, Harvey's was well-known to be acquisition-minded, and Harvey's was engaged in constant merger talks.

Facts are material for purposes of Rule 10b–5 if a "reasonable investor might have considered them important in the making of [an investment] decision." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S. Ct. 616, 24 L.Ed.2d 593 (1970). Whether facts relating to a future event are material depends "upon a balancing of both the indicated probability that the event will occur and the anticipated

magnitude of the event in light of the totality of the company activity." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756 (1969).

■ Appellant argues that the cases establish a rule as to when information concerning merger negotiations becomes material. We cannot find such a rule. Appellant relies primarily on our decisions in List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U. S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), and Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876 (2d Cir. 1972).[2] In List the defendant, who was a director of Fashion Park, purchased stock in the company from plaintiff. Two days prior to the sale Fashion Park commenced negotiations which ultimately led to a merger. However, defendant was unaware of these negotiations at the time of the purchase. He knew only that Fashion Park's board had resolved to seek a merger or sale and that there might be an unidentified purchaser on the horizon. We affirmed the decision of the district court that this information was not material. In Radiation Dynamics plaintiff sold stock in Technical Research Group (TRG) to an officer of TRG and others. At the time the shares were transferred TRG was pursuing negotiations which led to a merger and a sharp increase in the price of TRG's stock. This court affirmed a judgment for defendant entered on a special jury verdict that defendants did not have material information as to a reasonably possible merger at the time the commitments for the sale were made.

Neither case supports appellant's argument. In each case the court stated the definition of materiality of non-public information and then applied the def-inition to the facts before it. In neither case did the court purport to create a specific rule as to when information respecting a merger becomes material. Indeed, when plaintiff in Radiation Dynamics suggested such a rule the court responded, citing SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 849, that "such 'materiality' must be determined on a case-to-case basis according to the fact pattern of each specific transaction." 464 F.2d at 888. An examination of the facts here shows that they differ considerably from the facts in List and Radiation Dynamics.

■ Appellant quite properly contends that his numerous purchases of Harvey's stock must be analyzed individually. He argues that even if the information about the merger was material when he made his later purchases, it was not when he made his first purchases. We turn, therefore, to the purchases of January 6, appellant's first purchases of Harvey's stock.

■ In applying the test of Texas Gulf Sulphur, supra, we find that two significant events occurred shortly prior to Berman's January 6 purchases. The first was Friedland's giving to Shapiro non-public information about Ridge Manor's earnings for 1970. Using this information to construct a pro forma consolidated balance sheet, Shapiro and Berman projected that if the merger were consummated Harvey's earnings per share would climb from 29¢ to at least $2.24. Second, negotiations between Harvey's and Ridge Manor recommenced and Rosenbloom, a director of Harvey's, reacted favorably to the merger and promised to propose the merger to Harvey's board. Appellant already knew that Friedland, president of Ridge Manor, desired a merger with Harvey's. Although the negotiations had not jelled to the point where a merger was proba-

2. Appellant also relies on James Blackstone Memorial Library Ass'n v. Gulf, Mobile & Ohio R.R., 264 F.2d 445, 450 (7th Cir.), cert. denied, 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959); Alameda Oil Co. v. Ideal Basic Industries, Inc., 337 F.Supp. 194 (D.Colo.1972); and Mills v. Sarjem Corp., 133 F.Supp. 753 (D.N.J.1955). Assuming that these cases still represent good law, they do not bind this court. Moreover, each presented a very different factual situation from the case now before us.

ble, the possibility was not so remote that, when considered in the light of a projected increase of at least 600% in Harvey's earnings per share, it might not have influenced a reasonable investor.[3]

But we need not merely speculate as to how a reasonable investor might have received this information. The behavior of appellant, his partner Shapiro, and others who knew of the merger, all of whom were sophisticated investors, demonstrates empirically that the information was material. Almost immediately after the January 6 luncheon at which Rosenbloom responded favorably to the merger proposal, Shapiro and Berman purchased substantial amounts of Harvey's stock. In *Texas Gulf Sulphur,* supra, 401 F.2d at 851, the court found this type of evidence "highly pertinent" and "the only truly objective evidence of the materiality" of the inside information.

Appellant testified that he purchased Harvey's stock on January 6 and subsequently not because of his knowledge of the merger but because the stock "was fairly priced, it was cheap." However, neither Shapiro nor Berman had previously bought the stock, even though, as appellant conceded, the market conditions for it had been the same the previous November and December. In *Texas Gulf Sulphur,* supra, the court found that purchases by persons who had never previously bought stock in the company "virtually compel[led] the inference that the insiders were influenced by" the corporate secret. 401 F.2d at 851.

However, we need not decide whether the facts here establish such an inference as a matter of law because the district court found that inside information had influenced appellant, 349 F.Supp. at 54–55, and that finding was certainly not clearly erroneous.

We therefore affirm the finding that on January 6 appellant traded on the basis of material, non-public information. It follows that appellant also based his subsequent trades prior to public disclosure on February 18[4] on material, non-public information. Subsequent events brought a merger nearer, and nothing occurred to diminish its potential significance. The continuing purchases of Harvey's stock at increasing prices, not only by appellant and Shapiro but also by others who became privy to the inside information, amply demonstrates that reasonable investors continued to find the information material. Appellant has advanced no persuasive explanation for his purchases other than reliance on inside information. We therefore affirm the finding that all appellant's subsequent trades also violated section 10(b) and Rule 10b–5.

The SEC also charged appellant with violating the securities laws by "tipping" others about the merger negotiations. Appellant conceded that he may have told Unschuld of the merger negotiations. The district court found that appellant had passed such information. We affirm the holding that in this manner, too, appellant violated section 10(b) and Rule 10b–5.[5]

---

3. How important the merger might have been to Harvey's is demonstrated by the fact that the trading of appellant and others who knew of the merger pushed the price of Harvey's stock by February 18 to nearly three-and-one-half times what it had been at the beginning of the year.

4. Appellant's purchase of February 18 took place before investors had an opportunity to receive and react to the disclosures. See SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 853–854 & n. 18.

5. The SEC also claims that appellant committed violations by passing information of the merger to Frederick Robinson. Appellant concedes that he did discuss the merger with Robinson. He pursued these discussions in order to find a purchaser for Harvey's restricted shares, as Harvey's had demanded. Certainly Robinson violated the securities laws by trading on this information. Appellant initiated the negotiations for a proper purpose, however. The district court did not specifically decide whether appellant violated Rule 10b–5 in these discussions. Since the resolution of this question does not affect the relief granted, we decline to decide it.

B. *Injunctive Relief*.

The SEC sought, and the district court granted, an order enjoining appellant from further violations of section 10(b) and Rule 10b–5. Berman appeals from this order.

■ The critical question before the district court in considering injunctive relief was whether there was a reasonable likelihood that appellant would commit future violations. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972). The court concluded that a reasonable likelihood did exist. In attacking this conclusion appellant points to many factors weighing against injunctive relief. However, we do not review the decision of the district court de novo. In *Manor Nursing Centers*, supra, 458 F.2d at 1100, we stated that:

> "a district court has broad discretion to enjoin possible future violations of law where past violations have been shown, and the court's determination that the public interest requires the imposition of a permanent restraint should not be disturbed on appeal unless there has been a clear abuse of discretion."

■ Applying this standard of review, we affirm the grant of the injunction. Berman asserts that as he had never previously violated the securities laws the SEC could not show a "reasonable likelihood" of future violations. However, "first offenders" are not immune from injunctive relief. Two countervailing factors do indicate a likelihood of future violations. First, appellant made not one but seven purchases in the space of six weeks. Second, Berman is not an incidental or occasional investor. The violations occurred in the context of his regular business as a "corporate marriage broker." The same circumstances as occurred here, with the same enticements, may well crop up again. One who has displayed such frailty in the past and faces so many temptations in the future may well need the admonition of an injunction to obey the law.

■ Appellant next argues that an injunction was inappropriate because he could not have known he was violating the securities laws. More specifically, he first claims that our decision extends the prior law in this area.[6] *Cf.* Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969). He contends that no court has found violations in any case where a merger was as remote as it was here. Even if that is true, no court has held a defendant guiltless in a similar case, and we have reached our conclusions here by applying well-established principles. Appellant argues that the securities laws are complex and confusing and should not be strictly applied against a layman like himself. Appellant is no stranger to the securities markets. He is a professional who should know the law of his profession or pay the consequences of his ignorance.

■ Appellant next contends that he should not be enjoined because it was not shown that he acted in bad faith. It is not necessary to show bad faith, SEC v. Manor Nursing Centers, supra, 458 F.2d at 1096, especially where the SEC seeks injunctive relief. Compare Lanza v. Drexel & Co., 479 F.2d 1277, 1304 (2d Cir. 1973) (en banc). If it were, the lower court's finding that appellant exhibited "driving cupidity and lack of principle and restraint" would satisfy the need.

6. Appellant relied on SEC v. Texas Gulf Sulphur Co., 312 F.Supp. 77, 90 (S.D.N.Y. 1970), aff'd, 446 F.2d 1301, 1306 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). In that case, however, the district court had other evidence indicating no reasonable likelihood of future violations, including over five years of good behavior by the defendants. Moreover, *Texas Gulf Sulphur* was an extraordinarily innovative case, as everyone connected with the securities field well knows. Finally, the denial of an injunction there was, as always, discretionary. Our affirmance in no way implied that denial of the injunction was required as a matter of law.

In view of the foregoing, the district court was justified in finding an injunction necessary to protect the public interest. The SEC cannot keep constant surveillance over appellant. The deterrence of an injunction is clearly warranted.

### C. *Disgorgement of Profits.*

 Finally, appellant attacks the district court's computation of damages and appointment of a trustee.

The district court required appellant to disgorge not the actual profits realized when he sold shares in Harvey's after February 18, but the "paper" profits which had accrued as of February 18. Since the price of Harvey's stock dropped after February 18 appellant had to surrender more than he actually made.

The district court's approach was reasonable. A violator of the securities laws should disgorge profits earned by trading on non-public information. Once public disclosure is made and all investors are trading on an equal footing, the violater should take the risks of the market himself.

Moreover, a contrary holding would create a serious anomaly that might encourage insider trading. To require disgorgement only of actual profits in cases where the price of the stock subsequently fell would create a heads-I-win-tails-you-lose opportunity for the violator: he could keep subsequent profits but not suffer subsequent losses. Such a rule would emasculate the deterrent effect of Rule 10b–5.

This discussion should adequately answer appellant's argument that the disgorgement ordered here constituted a penalty. Appellant disgorged only unfair profits. His additional losses resulted not from any penalty imposed by the court but from his unwise investment decision to keep the stock after February 18. Furthermore, those Harvey's stockholders who sold their shares to appellant might, absent his fraud, have retained and sold their shares on February 18 when the price was much more attractive rather than during the later period. The effect of appellant's fraud was to deprive them not only of the profits actually realized by appellant but also of the opportunity to sell when the price was much higher. We see no reason why the injured shareholders should not be compensated for this "lost opportunity."

 Appointment of a trustee to receive the disgorged profits was discretionary with the district court. In this case it involved no abuse of discretion.

Affirmed.