What is disputed, however, is the SEC's additional request that the Court order Defendant to turn over all interest and returns from frozen assets from the time this Court entered [Doc. # 9] a Temporary Restraining Order on May 9, 2015. The SEC is not requesting that Mr. Ahmed pay prejudgment interest on frozen assets during the pendency of the asset freeze, but it contends that conversely, he is not entitled to interest or gains on assets while they were frozen, and those *29 moneys should be disgorged and returned to Defendant's victims. Thus, while recognizing that it can be improper to collect prejudgment interest on "funds [that] have been frozen in connection with an enforcement action," the SEC claims it is entitled to disgorge the accumulated returns on frozen funds: "[F]rozen funds 'turned over to the government in complete or partial satisfaction of the disgorgement order' should be turned over 'along with any interest that has accrued on them during the freeze period.' " S.E.C. v. Tavella , 77 F.Supp.3d 353, 361 (S.D.N.Y. 2015) (quoting Razmilovic , 738 F.3d at 36 ). "Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal." Id.
Defendants have not shown entitlement to interest and gains accrued during the pendency of the asset freeze and therefore the Court, as instructed by the Second Circuit in Razmilovic , orders the actual returns on the frozen assets, the amount of which have not yet been determined, must also be disgorged.
4. Civil Penalty[7]
Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. SEC v. Moran , 944 F.Supp. 286, 296 (S.D.N.Y. 1996). The Securities Act and the Exchange Act authorize three tiers of civil penalties. See 15 U.S.C. § 77t(d) ; 15 U.S.C. § 78u(d)(3). Third tier penalties are appropriate where "the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Razmilovic , 738 F.3d at 38 (citation omitted). At each tier, "for each violation, the amount of penalty 'shall not exceed the greater of a specified monetary amount or the defendant's 'gross amount of pecuniary gain.' " Id. (quoting 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B) ).
The actual amount of the penalty, within the bounds of the statute, is left to the discretion of the district court. Id. When making this determination, courts consider
(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.
SEC v. Haligiannis , 470 F.Supp.2d 373, 386 (S.D.N.Y. 2007).
The SEC asks the Court to impose a third-tier penalty equal to the amount of disgorgement, here roughly $41 million, based upon what it considers Defendant's egregious conduct. It argues that "Defendant engaged in premeditated, extensive, and continual fraud ... that was intended to (and did) inflict harm on those he was entrusted to help, so he could personally profit." (Pl.'s Mot. for Judgment at 16.) Relief Defendants maintain that *30 there is no support in this Circuit for imposition of a penalty that is 100% of the total disgorgement, and instead that the penalty should be restricted to only 10-20%.[8]
Despite Defendants' protestations, there is no dispute that the Court is authorized, should it so choose, to impose a civil penalty equal to the amount ordered disgorged, representing Defendant's gross pecuniary gain. See 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). Other district courts have done so. See, e.g., S.E.C. v. Haligiannis , 470 F.Supp.2d 373, 386 (S.D.N.Y. 2007) (ordering the "defendants to pay a penalty in the approximate amount of his ill-gotten gains: $15,000,000."); SEC v. BIC Real Estate Dev. Corp. , 2017 WL 1740136, at *6 (E.D. Cal. May 4, 2017) ("ordering the defendant to pay a penalty of $12,132,370, equal to his profit from wrongdoing"); SEC v. Zada , 787 F.3d 375, 383 (6th Cir. 2015) (upholding imposition of civil penalty, equal to the amount of ill-gotten gains, of over $56 million). On the other hand, some courts have declined to impose the maximum penalty. See, e.g., Sec. &Exch. Comm'n v. Nadel , No. CV110215WFKAKT, 2016 WL 639063, at *26 (E.D.N.Y. Feb. 11, 2016), report and recommendation adopted , 206 F.Supp.3d 782 (E.D.N.Y. 2016) (imposing third-tier penalty in the amount of $1 million where the disgorgement award was nearly $11 million); Razmilovic , 822 F.Supp.2d at 281-82 (declining to impose maximum civil penalty of over $41 million, and instead imposing civil penalty of over $20 million, equal to one-half of the disgorgement amount).[9]
The Court finds that the circumstances and consequences of Defendant's conduct warrant a significant penalty. Defendant's solo, flagrant, fraudulent conduct took place over many years, it was undoubtedly willful, with the sole motivation being to personally profit at the expense of his victims, whose resulting losses were immense. Defendant not only fled the country following his indictment on criminal charges in Massachusetts, but he has consistently and indignantly denied any wrongdoing whatsoever throughout the course of this litigation. There is no doubt Defendant utilized his professional talents and position to commandeer investors' funds purely for personal gain. Additionally, Defendant has not demonstrated that his financial condition warrants any downward adjustment, and his contention that the fine should be reduced based upon his inability to pay deserves little attention given that the SEC has already secured assets which are likely sufficient to satisfy the total award.
The Court is of the view that a civil penalty in the amount of $21 million, representing just over half of the total disgorgement *31 amount, is reasonable and justified on the facts of this case, which is far from a mere slap on the wrist, and is sufficient to effectuate the punitive and deterrent purposes of such penalties, while not being greater than necessary. See Razmilovic , 822 F.Supp.2d at 281-82.[10]
C. Assets Available to Satisfy the Judgment
The SEC asks the Court to find that the assets listed on the Asset Schedule (Ex. 1 to Pl.'s Mot. for Judgment) belong to Defendant and can be used to satisfy a judgment against him. Relief Defendants object to the process being used by the Court, arguing that it "would, among other things, improperly shift the burden of proof to Relief Defendants, requiring them to establish ownership over assets held in their names." ( [Doc. # 862 at 1.] ) According to Relief Defendants, the SEC is asking the Court to find that Relief Defendants are nominal owners of Mr. Ahmed's assets without providing an asset-by-asset analysis, which they claim is required under state law. (R. Def.'s Opp'n at 15 (citing McMahon v. United States , No. 3:09-CV-00046 PCD, 2010 WL 4430512, at *4 (D. Conn. Oct. 29, 2010) (requiring an asset-by-asset analysis to determine "whether property is held by a taxpayer's nominee.") ).)
However, Relief Defendants made this same argument before the Second Circuit and it was soundly rejected. The Second Circuit noted "Relief Defendants['] argu[ment] that insufficient evidence of nominee status renders the asset freeze overbroad[,]" and held that this "argument fails because Relief Defendants have been unable to point to any improperly frozen assets.... Relief Defendants do not allege that the referenced assets-a Fidelity account in Shalini's name and several trust accounts-properly belong to Relief Defendants, much less that they do not include proceeds of Iftikar's fraud." I-Cubed Domains , 664 Fed. App'x. at 56-7. Explicitly rejecting Relief Defendants' argument, the Second Circuit explained "[i]f Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." Id. at 57, n.3.[11]
Thereafter, Relief Defendants conceded that "the Second Circuit's ruling on Relief *32 Defendants' interlocutory appeal indicate[s] a significantly expanded task for Relief Defendants' expert in the attempt to trace funds in order to rebut the SEC's argument that the Relief Defendants are mere nominees[,]" which, they recognized, is a burden "[t]he Second Circuit's decision clearly places ... on the Relief Defendants." ( [Doc. # 339 at 6-7].) That Relief Defendants now pivot and attempt to avoid the burden of establishing ownership of frozen assets can only be explained by their inability to put forth any convincing evidence rebutting the SEC's contention that the assets belong to Defendant.[12]
The Court previously detailed the factors it would consider in determining ownership as to assets held in the name of Relief Defendants: " '[1] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever withdrew any funds from the asset.' " Ahmed I , 123 F.Supp.3d at 308 (quoting SEC v. McGinn Smith & Co. , 752 F.Supp.2d 194, 207-08 (N.D.N.Y. 2010) ).
1. Evidence That Relief Defendants are Nominal Owners of Defendant's Assets
Relief Defendants maintain that the SEC has failed to introduce evidence that Mr. Ahmed "dominated and controlled" any specific asset that a Relief Defendant is allegedly holding as his nominee, or shown that Mr. Ahmed enjoyed any monetary benefit from assets that were titled to the Relief Defendants, such as the UTMA trusts created for the sole benefit of their children. The Court rejects this attempt to avoid the burden of presenting evidence establishing Relief Defendants' ownership.
Relief Defendants have had every opportunity to refute the SEC's claim that Defendant actually owns all of the frozen assets throughout the course of this litigation, and yet have failed to do so. They cannot establish ownership of these assets simply by again complaining that the SEC has to prove that Mr. Ahmed controlled and benefited from assets in Relief Defendants' names, without offering any evidence that Relief Defendants in fact controlled and owned these assets. On the other hand, the SEC does put forth evidence that the seized assets belong to Mr. Ahmed and were placed in the names of Relief Defendants as nominees only, in an effort to protect and hide the fraudulently obtained assets.
Even Relief Defendant's own expert report found that from 2004 through 2014, Ms. Shalini Ahmed earned just over $1.9 million in gross income, and that all other "non-suspect" sources of income, totaling $62,758,960.96, belonged to Mr. Ahmed.
*33 (Ex. 15 (R. Def.'s Expert Report [Doc. # 888-15] ) to SEC's Mot. for Judgment ¶ 20.) Thus, 98.8% of all funds that the Ahmeds received during the past fourteen years came from Defendant. In light of these facts, it is difficult to see, and neither Defendant nor Relief Defendants provide any argument, much less a credible explanation, how Ms. Ahmed and her children could own more than $85 million in assets while Defendant owns less than $6 million in liquid assets. (See [Doc. 862-1] at 4.) Furthermore, the Ahmeds' lavish lifestyle greatly exceeded Ms. Ahmed's earnings over this ten year period, as Ms. Ahmed admitted her living expenses exceeded $46,000 per month. (See [Doc. # 69] at 14.)
Moreover, in her interrogatory responses, Ms. Ahmed claimed only to own a few assets,[13] and never supplemented this response to assert ownership of anywhere near the $85 million of assets she now claims belong to her and her children.[14] Further undermining her claim, Ms. Ahmed was unable to remember receiving more than $25 million in checks from Defendant, money she now claims to have managed (as discussed below).[15] Both Defendant and Ms. Ahmed refused to testify about the transfer and placement of assets into her name (aside from those that were nominally placed into Ms. Ahmed's name as a contingency plan). Defendant invoked his Fifth Amendment right against self-incrimination,[16] and Ms. Ahmed invoked the marital privilege.[17]
2. Relief Defendants' Claimed Assets
Relief Defendants now claim to own the vast majority of the frozen assets, yet fail to provide evidence of this ownership or to meaningfully challenge the SEC's evidence that Defendant owned and controlled the *34 currently frozen assets. Rather than explain why the factors above demonstrate that specific assets are indeed Relief Defendants' and should not be used to satisfy any judgment, Relief Defendants' Schedule A [Doc. # 862-1] offers as the basis for ownership only four "additional reasons for Relief Defendants' ownership," three of which the SEC correctly argues, even if taken as true, do not prevent the SEC from using the asset to satisfy a judgment against Defendant.[18]
First, Relief Defendants' contention that the SEC cannot collect any assets acquired more than five-years before the SEC commenced the action is incorrect. Although after Kokesh the SEC is no longer able to seek a disgorgement award for fraudulent conduct that occurred more than five years before the initiation of an action, it remains free to collect against all of Defendant's assets, no matter when they were acquired, in order to satisfy a judgment. See, e.g., SEC v. Banner Fund Int'l , 211 F.3d 602, 617 (D.C. Cir. 2000) (recognizing "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset," and that "an order to disgorge establishes a personal liability, which the defendant must satisfy regardless whether he retains the selfsame proceeds of his wrongdoing" (citing SEC v. Shapiro , 494 F.2d 1301, 1309 (2d Cir. 1974) ) ).
Additionally, Relief Defendants' claims that certain assets were purchased or funded, in whole or in part, with untainted funds are also irrelevant.[19] The SEC is free to collect on any of Defendant's assets, whether or not he used his ill-gotten gains to acquire them. Id. As the D.C. Circuit noted, "the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act." Id. It went on to explain that "the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge." Id. Thus, these reasons would be relevant only if Relief Defendants could show that the asset in question was purchased or funded with their untainted funds, as opposed to Mr. Ahmed's.[20]
*35 Accordingly, assets to which Relief Defendants claim ownership on any of these three grounds, and on no other basis, may be collected by the SEC to satisfy the judgment against Defendant.[21]
Relief Defendants' final reason for ownership, that an asset was a gift from a non-party, the SEC agrees is grounds for precluding the asset from being used to satisfy a judgment against Defendant. Still, Relief Defendants must offer some evidence that these were indeed gifts received from someone other than Mr. Ahmed, and have failed to do so here.
3. Ms. Ahmed's Claim of Managing Assets
In addition to the reasons listed in Relief Defendants' Schedule A, which as discussed above do not preclude a finding that those assets are available to satisfy a judgment against Defendant, Relief Defendants argue that most of the assets belong to them because Ms. Ahmed "contributed materially to developing and enhancing the corpus of marital property[,]" giving "her a cognizable right to that property." (R. Def.'s Opp'n at 19.) The SEC counters that Ms. Ahmed's "sudden management claim" is belied by the evidence and inconsistent with this Court's previous rejections of her claims to specific assets.
According to Relief Defendants, the fact that Mr. and Ms. Ahmed are married is critical because the quantum of proof needed to show that one spouse is the equitable owner of an asset titled to the other is meaningfully higher than where the primary defendant and relief defendant are not married. The sole case they cite in support of this contention, In re Vebeliunas , deals with the question of whether the veil of an irrevocable trust could be pierced under New York State law based on the argument that the debtor was the equitable owner of the trust. 332 F.3d 85 (2d Cir. 2003). There, the court found that the trust's equitable owner was the debtor's spouse, who had funded the trust with her own assets earned by investing her inheritance. Id. at 92. The court observed that because spouses "routinely share certain financial assets, such as streams of income," and "routinely administer each other's assets and conduct business on behalf of each other," these facts did not evidence control by the debtor *36 over the trust. Id. at 92-93. Here, though, Ms. Ahmed has not demonstrated that any of the assets were purchased or funded by her, and in fact the evidence is to the contrary, considering that nearly all of the funds acquired by the Ahmeds were earned or stolen by Defendant.
Specifically, as mentioned above, the Second Circuit held Defendant's salary belongs to him and was properly frozen to preserve his ability to pay an eventual judgment and, in the face of Ms. Ahmed's claims of managing certain assets, found that aside from her stock options and retirement accounts, which were unfrozen, she "failed to identify any other particular contributions to the marital estate." I-Cubed Domains, LLC , 664 Fed. Appx. at 57. To the extent Ms. Ahmed now attempts to argue that she acted as the "family CIO" and that this contribution entitles her to at least a portion of the marital estate, her argument misses the mark.[22]
Even if Ms. Ahmed legitimately managed the family assets, Relief Defendants provide no authority that where a spouse manages assets which were fraudulently acquired by the other spouse, the spouse managing those assets somehow gains an ownership interest in them such that the assets cannot be used to satisfy a judgment against the other spouse. Further, assuming Ms. Ahmed managed assets which were not fraudulently obtained, those jointly controlled assets can nevertheless be used to satisfy Defendant's judgment. See, e.g., SEC v. Smith , 646 Fed. Appx. 42, 43 (2d Cir. 2016) (rejecting the relief defendant's argument that the district court erred in applying all assets in a jointly controlled account - held only in the name of relief defendant - to satisfy final judgment against defendant); Sarasota CCM, Inc. v. Golf Mktg., LLC , 94 Conn. App. 34, 38, 891 A.2d 72, 74 (2006) (recognizing that Connecticut's "legislature's intent [is] to allow a judgment creditor to execute against all forms of a judgment debtor's assets" and therefore a creditor is "entitled to reach any property in which the judgment debtor had a cognizable interest" including the full amount of funds held in a joint account.)
In sum, Relief Defendants have not established ownership over any of the assets they identified on their Schedule A. Accordingly, the SEC may collect against all of the assets listed on the Asset Schdule.
4. Assets Defendants Claim Oak Already Recovered from Mr. Ahmed
Relief Defendants maintain that any disgorgement ordered to compensate Mr. Ahmed's alleged victims must be offset by the carried interest, which Oak has already taken, and by other assets belonging to Defendant that Oak holds, including capital contributions and K-1 distributions that Oak has seized or withheld. The SEC disagrees, citing contract provisions which provide that upon being terminated for cause, Defendant forfeited many of his interests relating to the Oak Funds, thus justifying the SEC's listing these assets as having a current value of $0 in the Asset Schedule.
The Ames declaration explains, and the contracts substantiate, that Defendant was forced to forfeit his interests in the General Partners, but retained the portion of his Class B membership interests in each of the Limited Partners that had vested by *37 March 31, 2015 (while forfeiting the unvested portion of such membership interests).[23] (2018 Ames Decl. ¶¶ 7-9, 14-17.) Specifically, Ms. Ames asserts that "in contrast to his interests in the Limited Partners, Mr. Ahmed's interests in the General Partners were not converted into Class B memberships" and "[i]nstead, because Mr. Ahmed was terminated for "Disabling Conduct", he was removed as a member of each of the General Partners and forfeited, for no consideration, the entirety of each of his interests in each of the General Partners." (Id. ¶ 15.)
Defendant concedes that the Oak Associates XIII-A, LLC operating agreement stipulated that on removal for cause or disabling conduct, all of a member's membership interest would be forfeited, but insists that this is the only agreement which so stipulated. (Def.'s Opp'n at 23.) However, the contracts support Ms. Ames' declaration-each General Partners contract including amendments thereto, specifies that "any Member who is removed by reason of having engaged in Disabling Conduct shall forfeit for no consideration such Member's entire membership interest, Percentage Interest and Capital Account and shall not become, or shall cease to be, as applicable, a Class B Member." (See Ex. J (Amendment to Oak Associates X, LLC Operating Agreement) to Ames' Decl. [Doc. # 890-10] ¶ 14; Ex. L (Amendment to Oak Associates XI, LLC Operating Agreement) to id. [Doc. # 890-12] ¶ 14; Ex. N (Amendment to Oak Associates XII, LLC Operating Agreement) to id. [Doc. # 890-14] ¶ 14; Ex. O (Operating Agreement of Oak Associates XIII, LLC) to id. [Doc. # 890-15] ¶ 7.4(a).)
Defendants do not dispute that Mr. Ahmed was terminated for "Disabling Conduct." Therefore, based on the language in the contracts, it is clear that Defendant forfeited his rights to any carried interest,[24] capital contributions, or K-l distributions from Oak Management Corporation, and accordingly they are appropriately assigned no value by the SEC.
Contrary to Relief Defendants' contention, this will not result in a double recovery by the Oak Funds because these forfeited interests are not ill-gotten gains that Oak is recovering from Defendant at all, but rather were sacrificed by Defendants upon his termination for "Disabling Conduct." Thus, Defendants' reliance on SEC v. Penn , 2017 WL 5515855, at *4 (S.D.N.Y. Aug. 22, 2017) for the proposition that the amount of disgorgement must be offset by the forfeited carried interest in the fund is misplaced. Because the Penn court reasoned that the defendant "is not required to disgorge amounts that he has already repaid [to the fund,]" it ordered an evidentiary hearing to determine what, if any, value was received by the fund from Penn's forfeiture. But, unlike in this case, Penn had a right to this "carried interest" prior to the criminal court forfeiting the asset. Id. Consequently, the Oak Funds here have not recovered from Mr. Ahmed by withholding and/or seizing his forfeited interests, and there is no resulting double recovery. Cf. SEC v. Levin , 849 F.3d 995, 1007 (11th Cir. 2017) ("[I]f any investor does ultimately recover from Levin, then *38 Levin could petition the court for a reduction in the disgorgement award because the recovery would constitute a partial return of Levin's ill-gotten gains.").
D. Appointment of a Receiver and Establishment of a Fair Fund
The authority of the district court to appoint a receiver to marshal, collect, and maintain assets, including judgments, with a view to distribution is well-established and appropriate where necessary to effectuate the purposes of the securities laws. See, e.g., SEC v. Manor Nursing Centers , 458 F.2d 1082, 1105 (2d Cir. 1972) ; SEC v. Investors Security Corp., et al. , 560 F.2d 561, 567 (3d Cir. 1977) (appointment of a receiver is an appropriate exercise of power and discretion of a district court). The SEC requests that a receiver be appointed to take control of all Defendant's assets, held in his name and the name of nominees, with the goal of repatriating the assets to victims. Plaintiff suggests that a receiver is necessary to oversee the sale of illiquid (and difficult to value) assets. Defendants protest that a receivership is not necessary here, arguing that since there is only one victim, Oak, there is no need to appoint a receiver to sort through competing claims, and that appointing a receiver would also result in unneeded costs.[25]
It will likely be necessary to appoint a receiver to hold the currently frozen funds and who will then effectuate a mechanism for distribution of assets to victims in accordance with this Ruling. The receiver would then ensure the return of any frozen assets to Defendant in excess of the amount required to satisfy the judgment against him. The appointment and scope of the receiver's duties will be determined post judgment. The SEC may submit a proposed receivership order for consideration by the Court.
Moreover, the SEC requests that the Court place Defendant's assets into a Fair Fund to compensate the victims of his fraud. A "fair fund for investors" is provided for by law:
If, in any judicial or administrative action brought by the Commission under the securities laws, the Commission obtains a civil penalty against any person for a violation of such laws, or such person agrees, in settlement of any such action, to such civil penalty, the amount of such civil penalty shall, on the motion or at the direction of the Commission, be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation.
15 U.S.C. § 7246(a). Thus, a Fair Fund affords "the SEC ... flexibility by permitting it to distribute civil penalties among defrauded investors by adding the civil penalties to the disgorgement fund." Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC , 467 F.3d 73, 82 (2d Cir. 2006). The SEC claims that because Defendant's fraud was long-running and concealed, and netted him more than he will be ordered to disgorge, a Fair Fund is especially appropriate.[26]
The Court recognizes that a Fair Fund may be a useful vehicle to make any distributions *39 of civil penalties to victims, if appropriate, but at this juncture is not sufficiently informed such that it can understand how this would function in the context of this case. The parties will be given an opportunity post-judgment to address the propriety and necessity of establishing a Fair Fund under these facts and circumstances.
III. Conclusion
For the foregoing reasons, the SEC's Motion for Remedy and Judgment is GRANTED with modification, for a total of $62,920,639.00 plus prejudgment interest for the period of time prior to the asset freeze,[27] and all interest and gains returned on the frozen assets during the pendency of the freeze. This total includes disgorgement of $41,920,639.00 and a civil penalty of $21,000,000.00 million. All of the assets listed on the SEC's Asset Schedule, which are currently frozen, are available to satisfy this judgment against Defendant. Moreover, Defendant is permanently enjoined from violating Section 17(a) of the Securities Act ( 15 U.S.C. § 77q(a) ), Section 10(b) of the Exchange Act ( 15 U.S.C. § 78j(b) ) and Rule 10b-5 thereunder ( 17 C.F.R. § 240.10b-5 ), and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act ( 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3) ) and Rule 206(4)-8 thereunder ( 17 C.F.R. § 275.206(4)-8 ).[28]
IT IS SO ORDERED.

Defendant offers no argument as to how imposing a civil penalty here violates the Eighth Amendment's Excessive Fines Clause, and therefore his citation to SEC v. Metter is puzzling. (See Def.'s Mot. for Summ. J. at 36 (quoting SEC v. Metter , 706 F. App'x 699, 703 (2d Cir. 2017) (The Second Circuit, "assume[d] without deciding that, in light of the Supreme Court's recent decision in Kokesh ... the disgorgement liability imposed in this matter was essentially punitive in nature and thus was a fine within the meaning of the Excessive Fines Clause of the Eighth Amendment.") ).)

Defendants do not attempt to persuade the Court not to impose a third-tier penalty, although Relief Defendants maintain that the SEC's request for civil penalty should be denied outright because disgorgement is already a penalty. However, as the Court noted in the context of the asset freeze, since "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud" and therefore civil penalties are required in order to deter and punish fraud. Ahmed I , 123 F.Supp.3d at 313 (quoting S.E.C. v. Moran , 944 F.Supp. 286, 296 (S.D.N.Y. 1996) ).

The facts of this case bear a striking resemblance to those in Razmilovic , where the defendant similarly perpetuated a pervasive fraudulent scheme spanning a number of years that involved "fraud, deceit, manipulation and deliberate, or at least, reckless disregard of regulatory requirements," which resulted in substantial losses to investors. "Yet instead of responding to the charges against him, the defendant fled the country, continue[d] to refuse to admit any wrongdoing, and ... never expressed any remorse for his conduct." 822 F.Supp.2d at 280.

The SEC also reasons that this civil penalty is appropriate given that the disgorgement award "will be insufficient to fully compensate victims from whom [Defendant] stole approximately $67 million" because Defendant's fraud extended beyond the five-year statute of limitations for the SEC's claims (Pl.'s Mot. for Judgment at 16), leading Relief Defendants to complain that the SEC's civil penalty is simply an attempt to circumvent the holding in Kokesh (R. Def.'s Opp'n at 33). However, the SEC has not asked for a penalty in excess of the Kokesh limits; it seeks a civil penalty that is limited to the total amount that may be disgorged under Kokesh .

See also SEC v. Colello , 139 F.3d 674, 677-8 (9th Cir. 1998) (rejecting relief defendant's argument "that the district court improperly placed the burden on him to show that he had a legitimate claim to the funds" and affirming summary judgment order because Relief Defendant "refused to give information necessary to determine whether he still possessed any of the funds or whether he had a legitimate claim to them."); Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc. , 276 F.3d 187, 192, n.5 (4th Cir. 2002) ("We have no doubt that the district court will provide the Relief Defendants with an opportunity to demonstrate the existence of a legally and factually valid ownership interest to some or all of the assets prior to ordering disgorgement." (citing Cavanagh I at 136-37 ) ); U.S. Commodity Futures Trading Comm'n v. EJS Capital Mgmt., LLC , 2015 WL 5679688, at *4 (S.D.N.Y. Sept. 24, 2015) ("Should [relief defendant] assert some legitimate interest in [disputed] funds, she must offer evidence of her entitlement; more than unsupported, conclusory assertions need to be proffered."); F.T.C. v. Bronson Partners, LLC , 674 F.Supp.2d 373, 394 (D. Conn. 2009), aff'd , 654 F.3d 359 (2d Cir. 2011) ("Relief defendant ... met her burden of demonstrating that she provided a legitimate service in exchange for monies paid to her by defendants. Accordingly, [she] is not liable for any portion of the restitution award.").

The Court has given Relief Defendants multiple opportunities to present evidence establishing their ownership of specific assets over the course of this litigation. Not only were Relief Defendants ordered to provide a list of assets to which they claim ownership, with "a fairly detailed analysis of why those identified assets are on a list claimed to be exempt from satisfaction of a judgment either against the Relief Defendants or Mr. Ahmed" (Ex. 12 to SEC's Mot. For Judgment at 17:5-18:14), they also had the opportunity to, and did, present evidence through their Opposition to the SEC's Motion for Judgment.

Ms. Ahmed asserted an ownership over only Unit 12A, Unit 12F, and the GRAT:
Notwithstanding these objections, Ms. Ahmed states that the asset freeze is inappropriate with respect to compensation she earned over the course of her employment, including grants of stock and retirement account contributions; her personal contributions to the marital estate; the Shalini Ahmed 2014 Grantor Retained Annuity Trust; the assets of DIYA Holdings, LLC; the assets of DIYA Real Holdings, LLC; her and her children's reasonable legal expenses; her and her children's reasonable living expenses; and any other assets that the Commission cannot legally demonstrate should be subject to the asset freeze.
(Ex. 16 (Interrogatory Responses) to Pl.'s Mot. for Judgment at 7.)

Ms. Ahmed also previously admitted it was Defendant who purchased both the 2009 Cadillac Escalade and 2009 Porsche Cayenne and that she did not know how he funded the purchases. (Ex. 7 (Ms. Ahmed Depo.) at 50:11-22.)

(See Ex. 7 (Ms. Ahmed Depo.) at 60:16-18 ("Q. Okay. Why did Iftikar Ahmed write you a check for $500,000 on January 7th, 2013? A. I don't remember."); Id. at 61:24-62:1 ("Q: And why did your husband write you a $2 million check on August 15, 2014?" A: "I don't remember."); Id. at 64:16-18 (Q: "Why did your husband write you a $500,000 check on September 23rd, 2014?" A: "I don't remember."); Id. at 69:5-7 (Q: "Why did Ahmed write you a $1.2 million check on November 6th, 2014?" A: "I don't remember."); Id. at 70:14-16 (Q: "Why did Iftikar Ahmed write you a $1.5 million check on November 17th, 2014?" A: "I don't remember."); Id. at 74:17-19 ("Why did your husband write you a $750,000 check on December 15th, 2014? A. I don't remember.); Id. at 78:12-14 (Q: Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015? A: I don't know.") ).

(See e.g. , Ex. 17 (Def.'s Depo. [Doc. # 888-17] ) to Pl.'s Mot. for Judgment at 21:3-16; 25:13-26:7; 28:18-29:10; 32:3-20; 36:11-37:3; 40:7-25; 43:24-44:19; 47:21-48:14; 52:6-23; 57:1-8; 58:12-59:8; 61:13-62:8; 65:22-66:20; 69:5-70:2; 72:9-73:6; 77:25-78:18; 82:22-83:15; 89:5-90:9; 96:18-98:1; 102:3-23; 108:22-110:4.)

(See, e.g. , Ex. 10 (Ms. Ahmed Depo. [Doc. # 888-10] at 476:13-16).)

Defendant argues only that the contents of the safe deposit boxes belong to his wife and the UTMA accounts belong to his children (discussed below). (Def.'s Opp.'n at 24-25.) With respect to the items in the safety deposit boxes, Ms. Ahmed did not even know of their contents until after the boxes were inventoried. (See, e.g. , [Doc. # 465-2] ("THE COURT: ... Is it still accurate that nobody knows what is in these safe deposit boxes? Mr. Deitch? MR. DEITCH: That's correct, your Honor").)

For instance, Ms. Ahmed claims to own Fidelity x7540 (see [Doc. # 862-1] at 1, entry 3), which holds more than $13 million (Asset Schedule at 3, entry 75). As noted above, Ms. Ahmed did not recall receiving the $18 million check (the proceeds of Defendant's Company B fraud) that funded this account, and specifically testified the account was opened only so she could access assets "should anything happen to [Defendant]." (Ex. 7 at 80:9-14) (Q: "Why was the Fidelity account in your name opened?" A: "So my husband had a significant illness, and I believe it was opened so that I had some assets where I could take care of the children should anything happen to him.").

Even if Ms. Ahmed purchased or funded assets with her own untainted funds, where ill-gotten funds are comingled with a relief defendant's legitimately obtained funds, the SEC is not required to trace specific funds to their ultimate recipients. I-Cubed Domains , 664 Fed. Appx. at 56. Because, as discussed below, the Court concludes that Relief Defendants are nominal owners of Defendant's assets, there is no need to apply the two part Cavanagh test. See I-Cubed Domains, LLC , 664 F. App'x at 55 ("the Cavanagh standard does not apply where an asset claimed to belong to a relief defendant is actually owned by a defendant, such that the relief defendant is a "nominee" for the defendant.").

Relief Defendants argue that both the Iftikar A. Ahmed Family Trust and the children's Uniform Transfer to Minors Act ("UTMA") accounts cannot be used to satisfy a judgment against Defendant because the beneficiaries are Defendant's descendants and the SEC has not shown they were funded by Defendant's illicit gains. (R. Def.'s Opp'n at 5.) Relatedly, Relief Defendants maintain that the MetLife insurance policy is also exempt from collection because it is owned by the Family Trust for the benefit of the minor children. The SEC counters that the Family Trust was funded with Defendant's money, including approximately $1.577 million from the Company G fraud and approximately $2.0 million from the Company I fraud. (Ex. A) (Defendant writing checks deposited to Family Trust). Because the evidence establishes only that Defendant funded this Trust, and there is no indication that any other Relief Defendant also did so, the Court is satisfied that the Family Trust was funded and created using Defendant's money and therefore can be used to satisfy a judgment against him.
In addition, Relief Defendants contend that the Family Trust is entitled to a significant portion of the Rakitfi Holdings account at Northern Trust ending x5218 because Defendant assigned 99% of his interest in Rakitfi Holdings LLC to the Family Trust in exchange for a promissory note of $1,510,000 at 2.25% annual interest. (R. Def.'s Opp'n at 6.) However, even if the record supported this claim, because the Court finds that Defendant controls the Family Trust, these funds are available for collection in either event.

Relief Defendants offer emails which they claim demonstrate Ms. Ahmed's management of the family assets. (See Exs. 29-34 to R. Def.'s Opp'n.) The SEC vehemently disputes that Ms. Ahmed in fact managed the family's assets, but the Court need not make this determination given its conclusion, discussed below, that the Court can reach jointly owned assets to satisfy a judgment against Defendant.

The SEC's Asset Schedule accounts for these frozen distributions which it agrees belong to Defendant. (See Asset Schedule at 2, entry # 36.) The vested portion of Mr. Ahmed's interests in the Limited Partners totals $683,172.00-$525,297.00 for 2015, $4,769.00 for 2016, and $153,106.00 for 2017. (2018 Ames Decl. [Doc. # 890] ¶ 20.)

Ms. Ames explains that "Mr. Ahmed's ownership interests in the General Partners ... provided for participation in the performance of the Oak Funds in which such General Partners invested on a basis comparable to other investors in the Oak Funds, which includes payment to the General Partner of a 'carried interest.' " (2018 Ames Decl. ¶ 13.)

Defendants' argument that the appointment of a receiver is a "drastic remedy" to be imposed "only where no lesser relief will be effective" carries little weight here, since the cases they rely upon deal with appointing a receiver during the pendency of litigation, where liability is still not established, as opposed to here where the receiver's role would be to effectuate collection of a judgment after liability has been found. See e.g., Ferguson v. Tabah , 288 F.2d 665, 674 (2d Cir. 1961) ; Commodity Futures Trading Comm. v. Comvest Trading Corp. , 481 F.Supp. 438, 441 (D. Mass. 1979).

The only argument regarding the Fair Fund made by Relief Defendants is that one may only be created with assets that fall within Section 2462's five-year statute of limitations, but the regulations to which they cite do not so provide. See 17 C.F.R. §§ 201.1100, 201.1102(b).

The SEC's revised calculation, discussed above at footnote 6, shall be provided no later than three days from the date of this Ruling.

The SEC shall file a proposed Order of Final Judgment within seven days of the date of this Ruling.